## LEAVITT, receiver, &c. *vs.* PALMER, &c.

The statute prohibiting banking associations from issuing or putting in circulation any bill or note unless payable on demand without interest, (*Stat.* 1840, *p.* 406, § 4,) is not confined in its interpretation to bills and notes capable of circulation as money.

Where a banking association, organized under the general law, issued negotiable promissory notes, payable in twelve months with interest, and delivered them to a mercantile house in London, on account of a previous liability of the bank; *held*, that the notes were illegally issued and void.

And *further held*, that a trust deed executed by the bank at the same time, transferring property and effects of the association to trustees for the purpose of securing the payment of the notes, was illegal and void.

Neither a prior debt nor any other good consideration will support a new contract which is in itself contrary to the provisions of law. *Per* BRONSON, J.

But where a deed or other contract contains distinct provisions, some of which are legal and some illegal, the former will in certain cases be upheld, although the latter are void. *Per* BRONSON, J.

An engagment of a banking association in the form of a certificate of deposit, payable at a future day, is in legal effect a promissory note, and as such is within the prohibition of the statute above mentioned. *Per* BRONSON, J.

A court of equity will not reform a deed or writing, unless it be alledged and proved that there was mistake or accident in the preparation of the instrument, so that it does not express the true intention of the parties.

Where a banking association agreed to secure a party to whom it was under a legal liability, and for that purpose executed its promissory notes for the amount of the liability in a form prohibited by law, and at the same time executed a trust deed of a portion of its effects, which, on its face, was declared to be *collateral to the notes*, but contained no reference to the original liability; *held*, that in the absence of any allegation or proof of mistake in the deed, a court of equity could not reform it so as to enable it to stand as security for the original liability.

In July, 1838, The North American Trust and Banking Company, an institution organized under the general banking law of that year, was established in the city of New-York. In September, 1841, it had become insolvent, and the appellant, David Leavitt, was appointed receiver of its effects under an order of the chancellor. In April, 1842, he filed the bill in this cause against Richard M. Blatchford and James B. Murray, trustees in the deed of trust hereafter mentioned, and against John Horsley Palmer and others, constituting the firm of Palmers, Mackillop, Dent & Co. merchants and bankers in London. There were other defendants, but they had no interest in the controversy. The case, so far as necessary to be stated, was this :

In February, 1840, the committee of investments and finance which managed the business of the North American Trust and Banking Company, resolved to purchase 5000 shares of the capital stock of the institution, and in order to raise funds for that purpose, they authorized the president to draw, or grant credits, on the London house above mentioned. Accordingly, on the 2d of March, 1840, the president addressed a letter of credit to the London house in favor of Thomas E. Davis of the city of New-York, stating in substance that the bank had authorized a credit in favor of said Davis for £46,875 ; the bills to be drawn at 90 days' sight, and to be covered by Davis at maturity, with an understanding that they should be renewed unless certain bonds of the company, secured by mortgages, then in the hands of the London house, should be previously cashed. On the same day Davis wrote to the London house, stating that the bank had authorized the above credit, that the transaction was designed exclusively for the benefit of the bank, but that he, Davis, held himself responsible to see that the bills were duly covered at maturity, with the privilege of renewal in the event already mentioned. The credit in question was sanctioned by F. Wilson of New-York, who was alledged in the bill of complaint to be the agent of the London house, in that city, with authority for that purpose.

Under this arrangement Davis drew bills on Palmers, Mac-

killop, Dent & Co., the London house,. which were accepted by them, and the proceeds, amounting to $217,898,75, or £46,050, were paid over to the bank and used in the purchase of the aforesaid 5000 shares of its capital stock.   The bill of complaint insisted that such purchase was in violation of the statute declaring it to be unlawful for any moneyed corporation to apply any portion of its funds, except surplus profits, directly or indirectly, in the purchase of shares of its own stock. (1 *R. S.* 589, § 1, *sub.* 5.)   The circumstances attending and preceding this purchase of stock were set forth in detail, but are unnecessary to be here stated.   It was also alledged that the London house, when it accepted the bills drawn by Davis, knew of the illegal purpose to which the proceeds were to be applied.   This was denied in the answer.

The bills were twice renewed, and in November, 1840, while the third set was running, it was agreed between the bank and Palmers, Mackillop, Dent & Co., by their special agents in New-York, that the bank should give to them its *certificates of deposit* for the amount of the bills payable in twelve months, renewable for six months longer, to be collaterally secured by an assignment to the defendants Blatchford and Murray, in trust, of certain specified securities belonging to the bank.   In pursuance of this agreement, on the 30th of November, 1840, the bank executed to the London house, forty-eight *notes* for £1000 each.   They were in the following form :

"NORTH AMERICAN TRUST AND BANKING COMPANY. £1000 St'g.  No. ——.            New-York, Nov. 30, 1840.

Twelve months after date, the North American Trust and Banking Company promise to pay to the order of Wm. R. Cooke, for value received, the sum of one thousand pounds sterling, with interest thereon, at the rate of seven per centum per annum, payable at the Banking House of Messrs. Palmers, Mackillop, Dent & Company, London.

THO'S G. TALMAGE, *President.*

Walter Mead, *Cashier.*     [Endorsed William R. Cooke.]

☞ This note is issued in pursuance of a deed of trust executed between the company, and Richard Milford Blatchford

and James B. Murray, trustees, and the payment of the same is guarantied by the securities thereby transferred."

At the same time with the execution of the forty-eight notes a deed of trust was executed by the bank of the first part, the said Blatchford and Murray of the second part, and Palmers, Mackillop, Dent & Co. of the third part, which recited that the aforesaid credit had been created for the exclusive benefit of the bank; that the bank desired to assume the liability to the London house, on account of such credit, and that Davis should be discharged therefrom; also that the bank had on that day assigned certain securities to said Blatchford and Murray in trust, &c., and had also on that day delivered to the London house *certificates of deposite* payable in twelve months, with interest, renewable for six months longer for the whole amount of the credit aforesaid. The deed then went on to provide that Blatchford and Murray should hold the securities so assigned until the whole of the said *certificates of deposite,* and the renewals thereof, should be paid. In case of default on the part of the bank in the payment, it was provided that the trustees should stand possessed of the securities so assigned for the *holders* of the certificates, and should proceed to realize the money on the securities, and pay the same over to the London house, or whoever should be the holders of said certificates, and after the charges and expenses of the trust should be paid, the residue of the securities assigned and of the moneys secured thereby to be held subject to the direction of the bank. Annexed to the trust deed was a schedule of the securities assigned, the estimated value of which was $273,700. Aside from the trust deed, there were *separate* assignments of the securities in question to the trustees.

The bill insisted that all the transactions above set forth were illegal and void; and the object of the suit was to set aside the forty-eight promissory notes, the trust deed and assignment of securities aforesaid, and to obtain a decree declaring that Palmers, Mackillop, Dent & Co. had no claim against the North American Trust and Banking Company, on account of any of those transactions. The cause was heard on pleadings and

proofs at a general term of the supreme court held in New-York, and in November, 1848, that court pronounced a decree declaring the claim of Palmers, &c. under the letter of credit, and for their charges thereon, to be a valid debt against the bank, and that the trust deed and assignment of securities to the defendants Blatchford and Murray, were also valid. The decree also declared that the forty-eight notes were void by the act of May 14, 1840, (*Stat. of* 1840, *p.* 306, § 4,) and directed them to be delivered up and cancelled. The receiver appealed to this court from so much of the decree as sustained the claim of Palmers, &c. and the trust deed and assignments. Palmers, &c. appealed from that part of the decree which declared the forty-eight notes to be void.

*S. Beardsley,* for the receiver. I. " *The North American Trust and Banking Company*" may not have been such a legal being as, by the late constitution of this state, required for its creation a two-third vote of the legislature ; still, *it was a corporation.* ( *The People* v. *The Supervisors of Niagara,* 4 *Hill,* 20 ; *S. C.* 7 *id.* 504 ; *Matter of the Bank of Dansville,* 6 *id.* 370; *Gifford* v. *Livingston,* 2 *Denio,* 380.) (1.) It was a " *moneyed corporation,*" within the meaning of the revised statutes. (1 *R. S.* 598, §§ 51, 52.) (2.) As such, it was subject to the general laws of the state respecting " *moneyed corporations,*" except where such laws are inconsistent with some special legislation as to this class of corporations. (*Sagory* v. *Dubois,* 3 *Sand. Ch. R.* 485 ; *Leavitt* v. *Yates, opinion of V. Ch. McCoun, MSS.*) (3.) It was within the provisions of the statute regulating the assessment and collection of taxes on " *moneyed corporations.*" (1 *R. S.* 414, *tit.* 4 ; *The People* v. *Assessors of Watertown,* 1 *Hill,* 607 ; *The People* v. *Supervisors of Niagara,* 4 *id.* 20 ; *S. C.* 7 *id.* 504.) (4.) It was subject to the " regulations to prevent the insolvency of moneyed corporations, and to secure the rights of their creditors." (1 *R. S.* 589, *art.* 1; *Leavitt* v. *Tylee,* 1 *Sand. Ch. R.* 207 ; *Leavitt* v. *Yates, supra.*) (5.) It was a corporation within the provisions of the " *restraining act,*" so called. (1 *R. S.* 711, 712, *tit.* 20;

*The Ontario Bank* v. *Schermerhorn*, 10 *Paige*, 109 ; *Safford* v. *Wyckoff*, 4 *Hill*, 442 ; *Attorney General* v. *Life and Fire Ins. Co.* 9 *Paige*, 470 ; 1 *R. S.* 599, § 55.) (6.) It was such within the meaning of the statute relating to the dissolution, and the appointment of receivers of the effects, of insolvent corporations. (2 *R. S.* 463, § 39 *to* 42 ; *Boisgerard* v. *The New-York Banking Co.*, *affirmed by the Chancellor*, 2 *Sand. Ch. R.* 23 ; *Sagory* v. *Dubois*, 3 *Sand.* 485.) (7.) It was such within the statute which prohibits corporations from exercising any corporate powers, except those *expressly* granted, and such as may be *necessary* to the exercise of the powers so granted. (1 *R. S.* 600, § 3.)

II. This corporation, like other artificial legal beings, had only such powers as were *expressly* conferred, or were *necessary* to the exercise of its express powers. (1.) This is the common law rule. (2 *Kent, 5th ed.* 298 ; *Angell & Ames on Corp.* 2d *ed.* 64 *to* 67, 192, 193, 200 ; *Dartmouth College* v. *Woodward*, 4 *Wheat.* 636 ; *The People* v. *The Utica Ins. Co.* 15 *John.* 383 ; *North River Ins. Co.* v. *Lawrence*, 3 *Wend.* 485 ; *Safford* v. *Wyckoff*, 4 *Hill*, 443 ; *Sharp* v. *Spear, id.* 83 ; *Hodges* v. *The City of Buffalo*, 2 *Denio*, 112 ; *N. Y. Firemen Ins. Co.* v. *Ely*, 2 *Cowen,* 709 ; *The People* v. *The Manhattan Co.* 9 *Wend.* 384 ; *Berlin* v. *New Britain*, 9 *Conn.* 180.) (2.) This principle is here, also, affirmed by statute. (1 *R. S.* 600, § 3 ; *See also Laws* 1838, *p.* 249, § 18.) (3.) The most important powers, although not all, which are implied in the creation of a corporation, are enumerated in the revised statutes. (1 *R. S.* 599, §§ 1, 2, 3 ; *Angell & Ames*, 2d *ed.* 64 *to* 67 ; 2 *Kent, 5th ed.* 277, 278.)

III. Corporations, created by or under the authority of statute law for specific purposes, are confined *strictly* to the powers so conferred upon them, and can only act in the *prescribed manner*, and for the *specified purposes and objects* of their creation. (2 *Kent, 5th ed.* 299, 290 ; *Head & Amory* v. *The Prov. Ins. Co.* 2 *Cranch*, 167, 169 ; *Bank of the U. States* v. *Dandridge*, 12 *Wheat.* 68, 69 ; *Beatty* v. *The Lessee of Knowler*, 4 *Pet.* 168 ; *Bank of Augusta* v. *Earle*, 13 *id.* 587 ; *Run-*

*yan* v. *The Lessee of Coster*, 14 *id.* 129 ; *The People* v. *The Utica Ins. Co.* 15 *John.* 383 ; *Berlin* v. *New Britain*, 9 *Conn.* 180 ; *N. Y. Firemen Ins. Co.* v. *Ely*, 2 *Cowen*, 699 ; *N. Y. Firemen Ins. Co.* v. *Ely*, 5 *Conn.* 568 ; *Salem Bank* v. *Gloucester Bank*, 17 *Mass.* 26 ; *Angell & Ames*, 2d ed. 167 ; *Safford* v. *Wyckoff*, 4 *Hill*, 443 ; *Bank of Chillicothe* v. *Swaine*, 8 *Ohio*, 286–8 ; *Steele* v. *Harmer*, 14 *M. & W.* 831.)

IV.ʻ Subject to the rights of *bona fide* holders for value, of the negotiable paper of a corporation which has power to issue such paper, it is competent for a corporation, in every case, to impeach any contract made by directors or other agents, in its name and professedly on its behalf, by showing that such contract was made *in a business*, or *for a purpose*, or *in a manner*, not authorized by its charter or by the law of the land. (*See the authorities referred to under the last point, and the following : The Penn. Del. & Mary. Steam Nav. Co.* v. *Dandridge*, 8 *Gill & John.* 248 ; *Hodges* v. *The City of Buffalo*, 2 *Denio*, 110 ; *Salem Bank* v. *Gloucester Bank*, 17 *.Mass.* 28–30 ; *Broughton* v. *Salford Water Works*, 3 *B. & Ald.* 1 ; *Moss* v. *McCollough, decided by the court of errors, Dec.* 1846 ; 2 *Kent*, 5th ed. 291 ; *Angell & Ames*, 2d ed. 239 ; *Safford* v. *Wyckoff*, 1 *Hill*, 11 ; *S. C.* 4 *id.* 442 ; *Smith* v. *Strong*, 2 *id.* 241 ; *Slark* v. *Highgate Archway Co.* 5 *Taunt.* 792 ; *Steele* v. *Harmer*, 14 *M. & W.* 831 ; *The Auburn Academy* v. *Strong*, 1 *Hop.* 284.)

V. Every person out of as well as within the state, who deals with a corporation, is bound at his peril, to know what its powers are. To this principle there is no exception, and it is particularly just where the corporation, as in this case, was created under a public statute of the state. (*Mumma* v. *The Potomac Co.* 8 *Pet.* 287 ; *Root* v. *Godard*, 3 *McLean's R.* 102 ; 2 *Kent*, 620, 621, *5th ed. ; Story on Agency*, 126, 127, § 19, 2d *ed. ; North River Bank* v. *Aymar*, 3 *Hill*, ʻ262 ; *Stainer* v. *Tysen*, *id.* 279.)

VI. It was illegal for this corporation to issue securities of any kind or description, to be loaned or put in circulation *as money*, except such as were countersigned and registered by the

comptroller, as required by the general bank law. Nor was this corporation in fact, at any time, authorized to issue any bill or note, unless the same was "made payable on demand and without interest." Hence the issue of bills of exchange, post notes, and certificates of deposit, payable at a future day, was unauthorized. (1 *R. S.* 712, §§ 3, 6; *Laws* 1829, *p.* 173, § 35; *See also* § 1 *of this act*; *Safford* v. *Wyckoff*, 1 *Hill*, 11; *S. C.* 4 *id.* 442; *Smith* v. *Strong*, 2 *id.* 241; *The Ontario Bank* v. *Schermerhorn*, 10 *Paige*, 109; *Att'y Gen.* v. *Life & Fire Ins. Co.* 9 *id.* 476.) The issue of such securities as those referred to was forbidden by the safety fund act, so called; by the revised statutes it was a penal offence; and by an act of 1840, the issue, by such a corporation as this, of any bill or note, not made payable on demand, and without interest, is declared to be a misdemeanor. (1 *R. S.* 712, § 7; *Laws* 1840, *p.* 306, § 4; *Act of May* 14, 1840; *Laws* 1829, *p.* 167, §§ 1, 35.) The issue of certificates of deposit payable with interest, at a future day, was as much within the statutes referred to, as post notes or bills of exchange would have been. (*Bank of Orleans* v. *Merrill*, 2 *Hill*, 295; *Swift* v. *Beers*, 3 *Denio*, 70; *Hayden* v. *Davis*, 3 *McLean's R.* 276; *Root* v. *Godard*, 3 *id.* 102; *Craig* v. *The State of Missouri*, 4 *Pet.* 433; *Southern Loan Co.* v. *Morris*, 2 *Barr's Penn. R.* 175; *Booth* v. *The Bank of England*, 6 *Bing. N. Ca.* 415; *Bank of England* v. *Anderson*, 3 *id.* 589.)

VII. The post notes issued in the name of this corporation on the 30th of November, 1840, for the amount claimed by Palmers, Mackillop, Dent & Co. were illegal and void. They were themselves illegal, being payable at a future day with interest: besides, they were intended to circulate as money, and so within the restraining act. (*Laws of* 1840, *p.* 306, § 4; 1 *R. S.* 712; *Laws of* 1829, *p.* 167, §§ 1, 35; *and see cases under point* 6.)

VIII. The trust deed of the 30th of November, 1840, was illegal and void. (1.) In terms it was to secure certificates of deposit to be paid, with interest, at a future time, but which were never issued, and which, if they had been, would have been illegal and void. (2.) This deed had no reference to the

,post notes issued on the same day, but as they were illegal and void, the deed could not be upheld by them. (3.) It was impossible ever to execute this trust according to the terms of the deed, as, by that, the trustees were to pay over the trust moneys to "*the holders of said certificates of deposit*," when there never could be any such holders. (4.) According to its terms, this deed was made to effect an *illegal object*—that is, to secure the payment of certificates of deposit, payable with interest, at a future time—it was therefore wholly void. (5.) It was void because made "contrary to the provisions of law," and for a purpose "foreign to the lawful business and objects of such corporation." (2 *R. S.* 463, § 33, *sub.* 7, 8; *id.* § 35; *id.* 461, § 31; *id.* 464, § 42; *id.* 465, §§ 46, 52; 3 *id.* 755; *The Att'y Gen.* v. *Wilson*, 1 *Craig & P.* 1; *Mackie* v. *Cairns*, 5 *Cowen*, 547; *Hyslop* v. *Clarke*, 14 *John.* 465; *Austin* v. *Bell*, 20 *id.* 449; *Goodrich* v. *Downs*, 6 *Hill*, 438.)

IX. So far as respects the legal character and effect of a contract, there is no difference between *malum in se* and *malum prohibitum*; or, between a prohibition without or with, a penalty: nor does it make any difference that a penalty only is imposed, without an express prohibition: nor, whether the act is, or is not, declared to be a misdemeanor. Every contract made to effect any such object is illegal, and whatever may be done under it is, as between the parties, absolutely void. The law will aid neither: *ex turpi causa non oritur actio*. (*Perkins* v. *Savage*, 15 *Wend.* 412; *Bartle* v. *Coleman*, 4 *Peters*, 184; *Craig* v. *The State of Missouri*, *id.* 410; *Nellis* v. *Clark*, 4 *Hill*, 124; *Griffith* v. *Wells*, 3 *Denio*, 226; *Bank U. S.* v. *Owens*, 2 *Pet.* 527; *Shackell* v. *Rosier*, 2 *Bing. N. Cas.* 634; *Langton* v. *Hughes*, 1 *Mees. & Welsb.* 593; *Ex parte Bell*, *id.* 751; *Bensley* v. *Bignold*, 5 *B. & Ald.* 335; *Canaan* v. *Bryce*, 3 *id.* 179; *De Begnis* v. *Armistead*, 10 *Bing.* 107; *Law* v. *Hodson*, 11 *East*, 300; *Forster* v. *Taylor*, 5 *B. & Adol.* 887; *Little* v. *Poole*, 9 *B. & C.* 192; *Smith's Law of Cont.* 120, *et seq.*; *The Miami Exporting Co.* v. *Clarke*, 13 *Ohio*, 18; *Wheeler* v. *Russell*, 17 *Mass.* 258; *Cope* v. *Rowlands*, 2

*M. & W.* 149 ; *Broom's Legal Max.* 349, 354 ; *Chit. on Con.* 5*th Am. ed. p.* 657, *ch.* 4.)

X. The several instruments which have been referred to were void no less as to Palmers, Mackillop, Dent & Co., although aliens residing in England, than as to citizens residing in New-York. A court will not lend its aid to any transaction in violation of the law of the country, whoever the violator may be, or wherever he may reside ; nor is it of any consequence in such cases, that the contract was made in, or to be performed in, a foreign country. (2 *Kent,* 5*th ed.* 458 ; *Story's Confl. of L.* 2*d ed.* § 244, *et seq. ; Le Roy* v. *Crowninshield,* 2 *Mason,* 157 ; *Greenwood* v. *Curtis,* 6 *Mass.* 358 ; *Varnum* v. *Camp,* 1 *Green's R.* 331 ; *Andrews* v. *Pond,* 14 *Pet.* 78 ; *The Executors of Cambioso* v. *The Assigns of Maffit,* 2 *Wash. C. C. R.* 98 ; *Bank U. S.* v. *Owens,* 2 *Pet.* 538 ; *Hanna* v. *Eve,* 3 *Cranch,* 242 ; *Morck* v. *Abel,* 3 *B. & P.* 38 ; *Biggs* v. *Lawrence,* 3 *D. & E.* 454 ; *Clugas* v. *Penaluna,* 4 *id.* 466 ; *Bank of Augusta* v. *Earle,* 13 *Pet.* 588, 9 ; *Root* v. *Godard,* 3 *McLean's R.* 103 ; *Forbes* v. *Cochrane,* 2 *B. & C.* 448.)

XI. The contracts to which reference has been made, that is, the bills of exchange, certificates of deposit and post notes, as well as the trust deed, being in their nature illegal, could not in any way be authorized by, or be the act of, the corporation. The individuals who assumed, in these respects, to act for and bind the corporation, violated the law, but their illegal acts can not be imputed to the corporation, which in no way authorized or concurred in them. As to the corporation and the receiver, these illegal and wholly unauthorized acts were absolutely void. (2 *R. S.* 463, § 33, *sub.* 7, *and* § 35 ; *id.* 464, § 42 ; *id.* 465, § 52 ; *id.* 469, § 67 ; *Robinson* v. *Smith,* 3 *Paige,* 222 ; *The Char. Corp.* v. *Sutton,* 2 *Atk.* 406 ; *Att'y Gen.* v. *Wilson,* 9 *Sim.* 53 ; 1 *Craig & Phil.* 1, *S. C. ; Wyman* v. *Hallowell & Augusta Bank,* 12 *Mass. R.* 62 ; *Salem Bank* v. *Gloucester Bank,* 17 *id.* 1, 29, 30 ; *Hartford & New-Haven Rail-Road Co.* v. *Croswell,* 5 *Hill,* 386 ; *The President, &c.* v. *Hart,* 3 *Day,* 491 ; *National Bank* v. *Norton,* 1 *Hill,* 572 ; *The Life & Fire Ins. Co.* v. *Mech. Fire Ins Co.* 7 *Wend.* 31 ;

Leavitt *v.* Palmer.

*Minor* v. *Mech. Bank of Alexandria,* 1 *Pet.* 70, 71; *Commercial Bank* v. *Cunningham,* 24 *Pick.* 276.)

XII. The trust deed, by its terms, was made to secure certificates of deposit, but which were not issued, post notes being substituted in lieu of such certificates. The post notes were illegal and void, as certificates, if issued, would also have been. If it were conceded that the corporation was honestly indebted to Palmers, Mackillop, Dent & Co. in the full amount, for which said post notes were issued, still, a court of equity could not extend and uphold this trust deed, so as thereby to secure the amount of such *bona fide* indebtedness, for it could not change what had been agreed upon between the parties so as thereby to make a new and different security. (*Hunt* v. *Rousmanier,* 2 *Mason,* 342; 8 *Wheat.* 174, *S. C.;* 3 *Mason,* 294, *S. C.;* 1 *Peters,* 1, *S. C.*)

XIII. The post notes and trust deed should be declared void and be delivered up to the receiver to be cancelled, and the trustees Blatchford and Murray should account for and transfer and pay over to the receiver every thing which has come to their hands under the trust.

*C. O'Conor,* for Palmers, Mackillop, Dent & Co. I. The company had authority to grant a mortgage upon its assets, to secure a creditor; and the trust deed in question is effectual in form and substance. (*Commercial Bank* v. *Cunningham,* 24 *Pick.* 275; *De Ruyter* v. *St. Peter's Church,* 3 *Barb. Ch. Rep.* 126, *and cases cited;* 7 *Paige,* 570.)

II. The company having agreed with Palmers, Mackillop, Dent & Co. for a new and valuable consideration, to pledge to them the securities in question, and having actually assigned and delivered the securities, equity will reform any defects arising from mistake or accident in the written instruments. (1 *Story's Eq. Jur.* §§ 115, 136, 152, 158, 159, 160, 165; *id.* §§ 94, 170, 172, 99 *b. 4th ed.; Watkins* v. *Maule,* 2 *Jac. & Walk.* 242.) The granting of further time to the company, and the release of T. E. Davis, the guarantor of the credit, are sufficient considerations to uphold this equity. (*Wilmot* v. *Corp. of*

*Coventry*, 1 *Younge & Coll.* (*Excheq.*) 522 ; *Mestaer* v. *Gilles-pie*, 11 *Ves.* 620 ; *Pye* v. *Danbuz*, 3 *Bro. P. C.* 596.) There is nothing in the terms of the original agreement, or in the language of the trust deed importing that the certificates are to be negotiable, and *ut res magis valeat quam pereat*, the court will not infer an unlawful intention. (2 *Barr's Pa. Rep.* 175, 177 ; *Hobart's Rep.* 277 ; 10 *Paige*, 114 ; 1 *Hill*, 292 ; 3 *Cowen*, 284.)

III. Palmers, Mackillop, Dent & Co. have a right to stand upon the separate transfers and assignments of the securities ; referring to the original agreement for a declaration of the purposes ; and, at least in a court of equity, may sustain their lien either upon the separate assignments, or upon the trust deed, without producing the certificates of deposit ; especially as it is admitted in the pleadings that though agreed for, and intended, such certificates were never delivered by reason of some accident or inadvertence. (*Edgell* v. *Stanford*, 3 *Verm. Rep.* 205 ; *Bates* v. *Bank of Alabama*, 2 *Alab. N. S.* 487, 488 ; *United States* v. *Bradley*, 10 *Peters*, 344 ; 1 *Watts*, 388.)

IV. The provisions of 1 *R. S.* 591, § 9, declaring void all assignments, &c. by any moneyed corporation "when insolvent or in contemplation of insolvency, with the intent of giving a preference to any particular creditor over other creditors of the company," and of the same statute, *p.* 589, § 1, *subd.* 5, forbidding directors "to apply any portion of the funds of their corporation, except surplus profits, directly or indirectly to the purchase of shares of its own stock," do not, nor do either of them, apply to companies incorporated under the general banking law. (1.) Although these companies are necessarily corporations, in judgment of law, and could not, by any legislative act, be divested of that character ; yet the legislature had power to divest them of any legal quality not inseparably incident to their existence. (2.) Although an accurate *knowledge* of the *common law*, or capacity to judge of the *construction* of previous statutes, may not be imputable to the legislature ; yet that department has power to declare, in reference to the future, that a word or phrase in prior legislation, legally descriptive of a class,

shall not embrace particular members of that class.  (3.) The legislature has, by plain and manifest implication, equally forcible and binding with an express declaration, manifested its will, that the statutory provisions concerning "moneyed corporations," above referred to, shall not be deemed applicable to associations under the general banking law.  (1 *R. S.* 589; *Laws of* 1838, *p.* 250; *id.* 1841, *p.* 308, § 2; *id.* 1839, *p.* 328; *id.* 1840, *p.* 154; *id.* 1841, *p.* 33, §§ 2, 3, *and p.* 106; *In re Bank of Dansville,* 6 *Hill,* 370.)

V. The forty-eight bills or notes are not void, by the act of May 14, 1840, section four; but, on the contrary, are valid and effectual obligations against the company.  The statute prohibits the *issuing* or putting in circulation bills and notes unless payable on demand with interest.  The word *issue* has a technical meaning, and does not apply to instruments such as those in question.  (*See the following statutes:* 1 *Jones & Varick,* 79; *id.* 162; *id.* 183; *id.* 291, § 24; *id.* 293, §§ 32, 33, 34, 37; *id.* 249; 2 *id.* 212, § 2; 1 *Kent & Radc.* 251, § 3; 1 *R. L.* 405, §§ 1, 3; *id.* 407, §§ 10, 11; *id.* 412.)  The section in the act of 1840, applies only to the bills and notes countersigned by the comptroller; or, at least, is limited to instruments capable of circulating as money within this state.  (1 *R. S.* 612, 2*d ed.;* 10 *Paige,* 114; *Bouvier's Dict. tit.* "*Bill,*" "*Simplex,*" "*Single.*")  The forty-eight bills or notes were not intended to circulate as money, nor are they capable of such circulation. If the forty-eight bills or notes are prohibited by the statute, they are not, on that account void as against the bank; especially as they were to be delivered to an English creditor, as security for an English debt, and were made payable in England.  (4 *Hill,* 460, 464; 3 *Metc.* 581; 15 *Wend.* 415, *and cases cited; Ferguson* v. *Norman,* 5 *Bingh. N. C.* 76; 9 *Paige,* 477, *per Walworth, Chancellor;* 3 *Rand.* 101.)

BRONSON, J. delivered the opinion of the court.  I shall assume, but without intending to express any opinion on the subject, that the purchase of the five thousand shares of the capital stock of the bank, and all the acts of the bank, its offi-

cers and agents, relating to that transaction, down to the time of executing the trust deed and the accompanying securities, were legal in their nature, and within the legitimate powers of the corporation. The case then, so far as it will come under consideration, and speaking of it from the face of the papers, is shortly this: The bank on the second of March, 1840, gave Thomas E. Davis a letter of credit on Messrs. Palmers, Mackillop, Dent & Co. of London—of whom, for the sake of brevity, I shall hereafter speak as the Palmers, or Palmers & Co.—for forty six thousand eight hundred and seventy-five pounds sterling; for which sum Davis was to draw bills on the Palmers at ninety days' sight, which were to be covered by him at maturity; with the right of renewal in a certain event. Davis drew the bills, and they were accepted by the Palmers: they were twice renewed, and the third set was running at the time the trust deed was executed. The bank was not then a debtor to Palmers & Co. on account of this transaction; but was under a contingent liability which would make it a debtor in case the bills should not be provided for by Davis at maturity. In this state of things, the bank, on the thirtieth day of November, 1840, made forty-eight negotiable promissory notes, amounting in the aggregate to forty-nine thousand five hundred and seventy-five pounds sterling, payable twelve months after date, with interest, to the order of William R. Cooke, a teller in the bank, who indorsed the notes, and they were then delivered to the Palmers on account of the liability which has been mentioned. The bank at the same time, and as part of the same transaction, executed the trust deed, and assigned 'the stocks, bonds and mortgages mentioned in the schedule to the deed, for the purpose of securing the payment of the forty-eight promissory notes. These undertakings and securities the complainant seeks to set aside as illegal and void.

The first question which I shall consider is upon the validity of the notes. And I feel no difficulty in agreeing with the supreme court, that the notes are illegal and void. They were issued in direct violation of a statute, which provides, that "no banking association" "shall issue or put in circulation any bill

or note of said association," " unless the same shall be made payable on demand, and without interest ;" and every violation of the section by any officer or member of a banking association is made a misdemeanor, punishable by fine or imprisonment, or both, in the discretion of the court. (*Statutes of* 1840, *p.* 306, § 4.) The notes were not made payable " on demand," nor " without interest ;" but had a year to run, and were then payable with interest. It is said on the part of the defendants, that the prohibition only applies to bills and notes which are capable of circulating as money. But the statute contains no such qualification. In terms, it extends alike to all bills and notes issued by a banking association ; and there is no reason to suppose that the legislature intended it should have a more restricted application. And besides, negotiable promissory notes and bills of exchange payable at a future day, when issued by a bank in good credit, may perform, to a great extent, the office of a circulating medium. This has never been doubted by those who have considered the subject. (*Safford* v. *Wyckoff,* 1 *Hill,* 11 ; *Smith* v. *Strong,* 2 *id.* 241 ; *Bank of Orleans* v. *Merrill, id.* 295 ; *Att'y General* v. *Life and Fire Ins. Co.,* 9 *Paige,* 470 ; *Ontario Bank* v. *Schermerhorn,* 10 *id.* 109 ; *Bank of England* v. *Anderson,* 3 *Bing. N. C.* 589 ; *Booth* v. *Bank of England,* 6 *id.* 415.) Indeed, the fact that such paper may enter into the currency of the country is matter of history. Witness the post notes of the late Bank of the United States, and the negotiable notes and bills of some of our own banks, which followed, though on a more humble scale, both the frauds and the bankruptcy of the national institution. The issuing of such paper belongs to mercantile and commercial transactions; and not to the business of banking. Experience has shown that the banks which engage in such enterprises are rotten, and sooner or later will end in defrauding the community. In addition to the North American Trust and Banking Company, several others of the general law banks had been engaged in issuing such paper before the act of 1840 was passed; and such of those institutions as had not already failed, were soon afterwards in a state of bankruptcy. Great frauds upon the

public had been committed. The legislature saw the evil; and evidently intended to cover the whole ground, by using the most general and comprehensive terms :—" No banking association shall *issue* or put in circulation *any bill or note*," unless, &c. There had long been a similar statute in relation to the safety fund banks; (*Stat.* 1829, *p.* 178, § 35 ;) and the act of 1840 was passed to extend the express prohibition to the general law banks, which had come into existence at a later period. That these statutes. extend to negotiable promissory notes and bills of exchange payable at a future day has been decided, both here and elsewhere. (*Swift* v. *Beers*, 3 *Denio*, 70 ; *Tylee* v. *Yates*, 3 *Barb.* 222 ; *Root* v. *Godard*, 3 *McLean*, 102 ; *Hayden* v. *Davis, id.* 276. *And see Ontario Bank* v. *Schermerhorn*, 10 *Paige*, 113.) No judge has, I think, ever expressed a different opinion. Although the judgment of the supreme court in the case of *Safford* v. *Wyckoff*, (1 *Hill*, 11,) which was upon a bill of exchange drawn in 1839, was reversed by the court of errors, no one seems to have doubted that the future issue of such paper was prohibited by the act of 1840. (4 *Hill*, 442, 454, 460, 461.) And it probably never would have been doubted, had it not been for the bold and reckless manner in which the officers of the N. A. Trust & Banking Company continued to issue such paper after the statute was passed, and the impunity which they have since enjoyed.

As the issuing of the notes was expressly prohibited by law, it is impossible to maintain that they are valid securities. To hold that they can be enforced against the bank, would be going very far towards defeating the end which the legislature had in view. That they are void has been adjudged in several of the cases already cited ; and I am not aware of any authority to the contrary. The legal liability on account of which the notes were issued still remains; but the notes themselves are void.

The trust deed does not speak of promissory notes *eo nomine ;* but recites that the company had on that day executed and delivered to Palmers & Co. their certificates of deposit, payable in twelve months from date, with interest. Such instruments,

whatever names the parties may give them, are promissory notes. They are engagements to pay certain sums of money to the persons therein named, at a specified time, and at all events. A promissory note imports a consideration, and none need be mentioned. But though a consideration be mentioned in a written promise to pay money, whether it be done in general terms, as by the words " for value received," or by specifying the kind of value, as a deposit of money, it is still a promissory note. And if certificates of deposit, payable to the Palmers at a future day, had been issued in lieu of the notes which were actually delivered, they would have been promissory notes, coming equally within the prohibition of the statute, and being equally void. (*Bank of Orleans* v. *Merrill*, 2 *Hill*, 295 ; *Southern Loan Co.* v. *Morris*, 2 *Barr*. 175. And see *Craig* v. *State of Missouri*, 4 *Pet*, 433.) Indeed, I did not understand the defendants' counsel to deny, that certificates of deposit payable at a future day are promissory notes : but it was said not to appear, that the certificates were to be made negotiable. I will not stop to inquire whether the statute extends to notes which are not negotiable ; (*see Ontario Bank* v. *Schermerhorn*, 10 *Paige*, 113, 114 ;) for I think it quite evident that the certificates were to be negotiable. The notes actually issued with the trust deed were negotiable ; and the statement at the foot of the notes that they were issued in pursuance of a trust deed, and that the payment of them was guarantied by the assigned securities, shows that it was intended they should pass beyond the hands of the Palmers. And although the fact does not expressly appear, it is plainly inferable that all the various written engagements to pay money which the bank had before made and sent abroad for sale in foreign markets were in a form to pass from hand to hand by mere delivery. In a letter of the president of the bank to the Palmers, dated the 22d of October, 1838, he speaks of the certificates of deposit issued by the company as a part of its " course of banking"—as " representatives of money" issued " upon the credit of the company :" and several of those instruments, amounting in the aggregate to £22,-500 sterling, were sent to the Palmers, with the letter, "to be

sold" to other persons than the payees named in them, with an assurance that the capital of the bank would "afford an abundant indemnity to the holders." There are many other things in the case going to show, that all of the engagements of the bank to pay money which were sent abroad were in a negotiable form. But without looking into other transactions, it sufficiently appears from the trust deed, that the obligations which were to accompany it, by whatever name they might be called, were to be made negotiable. The trust was not created for the security of the Palmers alone, to whom the certificates were to be executed and delivered; but after a default in payment, the trustees were to stand possessed of the assigned securities in trust for the "holders" of the certificates; and were to proceed to the realization of the securities, by sale or otherwise, and pay over the moneys "unto the said Palmers, Mackillop, Dent & Co., *or any other parties who may then be the holders of said certificates*, until the amount *owing to the holders* of the said certificates of deposit shall be fully paid." A subsequent clause in the deed is in nearly the same words; and other parts of the instrument show that the certificates were to pass beyond the hands of the payees. It is impossible not to see that the parties intended the certificates should be negotiable instruments. If, therefore, certificates of deposit, instead of post notes, had been issued, they would, as negotiable promissory notes, have been open to the same objection which overturns the instruments which were actually issued.

The next question is upon the validity of the trust deed; and I am unable to separate that instrument from the fate of the notes or certificates of deposit. Both were executed at the same time, and as parts of one and the same transaction. The deed was made to give the greater credit and circulation, and secure the ultimate payment of the illegal notes or certificates of deposit; and I do not see how the deed can stand, when the other instruments must fall. It is true that both had a good consideration, in the existing liability of the bank to indemnify the Palmers against the bills which had been drawn and accepted under the letter of credit. But neither a prior debt, nor any

other good consideration, will support a new contract which is in itself contrary to the provisions of law. And although it is true in this case that the payment of the notes would have the effect of discharging the prior liability of the bank to the Palmers, yet the deed was made to secure the performance of the new contract. The recitals in the deed show an intention to indemnify the Palmers, as acceptors, against the bills which Davis had drawn under the credit : but the parties intended to effect the object in an illegal manner ; to wit, by issuing prohibited certificates of deposit, and assigning certain property to secure the payment of the certificates. A legal purpose must be carried into effect by legal means. When we get beyond the recitals, and come to the covenants and stipulations in the deed, there is not a single word about the prior liability of the bank ; but the whole is about the certificates of deposit. The trustees are to hold the assigned securities until the certificates of deposit shall be paid : to hold the securities in trust for the bank until default shall be made in the payment of the certificates of deposit ; and after default, in trust for the holders of the certificates of deposit. And the trustees are thereupon to proceed to the realization of the assigned securities, and to pay over the moneys to Palmers & Co., or to the other holders of the certificates of deposit. And so the parties proceed to the end of the instrument, at every step making stipulations concerning the certificates of deposit, without any covenant, grant, or even allusion to or concerning any other liability on the part of the bank. The transaction amounted to this—neither more nor less—there was a promise, which, though founded on a good consideration, was forbidden by law, and therefore void ; and an assignment of property in trust to secure the performance of the illegal promise. Such a trust cannot be supported.

It is undoubtedly true, that where a deed or other contract contains distinct undertakings, some of which are legal, and some illegal, the former will in certain cases be upheld, though the latter are void : and if there had been an additional provision in this deed, that the assigned property should be held as a security for the original liability of the bank, that part of the

deed might be allowed to stand, though the. trust for the payment of the certificates should fail. But there is no agreement or stipulation in the deed for securing the original liability of the bank—nothing of the kind.

Again ; although it appears from the recitals in the deed, that one object of the arrangement of the 30th of November, 1840, was to secure the performance of the original undertaking of the bank, it was, as I have already remarked, to be done in an illegal manner ; to wit, by issuing prohibited notes or certificates, and assigning property to secure the performance of the new and vicious contract. A legal end can not be attained by illegal means.

The ground on which the counsel for the defendants seemed mainly to rely was, that the deed should be reformed, so as to make it a security for the original liability of the bank. His printed point touching the question is as follows—" the company having agreed with Palmers, Mackillop, Dent & Co. for a new and valuable consideration, to pledge to them the securities in question, and having actually assigned and delivered the securities, equity will reform any defects, arising from mistake or accident, in the written instruments." There are several difficulties standing in the way of this argument. So far as relates to the notes or certificates of deposit, it was of no practical importance, as we have already seen, which should be issued ; for both would be alike void. As to reforming the deed, there is no bill or application for that purpose : not even an allegation in the answers, that there was any mistake or accident in preparing the instrument, or that it does not express the real intention of the parties. If we could see that there had been a mistake in drawing up the deed, it could not be reformed without filing a bill for that purpose ; nor could we read and enforce the instrument as though it had been properly drawn. We should be obliged to follow the deed as it is. But what is, if possible, still more conclusive, there is not a particle of evidence to show that there was any mistake or accident in preparing the deed, or that it is not just what the parties intended it should be ; and it could not be reformed in equity, if a bill had been filed for

that purpose. It is true that the parties intended to secure the original liability of the bank; but so far as appears, they intended to do it in the very way it has been done; and that way is illegal. If they mistook the law, we can not grant relief by making a new contract for them. This question was very fully considered in the case of *Hunt* v. *Rousmaniere*, (2 *Mason*, 342, 8 *Wheat.* 174, 3 *Mason*, 294, 1 *Pet.* 1; *and see* 1 *Story's Eq.* §§ 114, 115;) which underwent a great deal of discussion, and is directly in point.

There were separate assignments of the several securities mentioned in the schedule to the trust deed; but they were all made to Blatchford and Murray as trustees; were executed and delivered simultaneously with the execution and delivery of the deed; and were made for the purposes expressed in that instrument. Those purposes were to secure the payment of the certificates of deposit. The reason for making separate assignments probably was, greater convenience in recording in the proper counties, and in making subsequent transfers and discharges. But however that may be, the assignments are but a part of one entire act; and can not be separated from the fate of the deed and promissory notes which were executed at the same time, and as parts of the same transaction.

I have purposely avoided the expression of any opinion on the several important questions which were so ably discussed at the bar, touching the purchase of the five thousand shares of the capital stock of the bank, and the means which were used to raise the necessary funds for that purpose. I have done so, because in the view which has been taken of the case, it was not necessary to consider those questions: and for the further reason, that after this bill was filed, an order of the court of chancery was made, by the consent of these parties, in the suit of Tracy against the bank, referring it to a master to take proofs, and report upon the claim of the Palmers to be creditors of the bank. The master was also to ascertain what part of their claims, if any, was secured by trusts, and what preferences they claimed under the trusts; but he was not to report on the validity of the trusts, or the right to a preference under them.

Those questions were to be settled in other suits then pending. This is one of those suits ; and the view which has been taken of the case, disposes of this trust, and the preference claimed by Palmers & Co. under it. If it has not already been done, it will be settled in the Tracy suit, whether the Palmers are creditors of the bank ; and if they are, they will come in with other creditors, and share in a ratable distribution of the assets of the bank ; or will receive the whole of their debt, if the assets are sufficient to satisfy all of the creditors. The opinion which I have expressed does not, in its consequences, go beyond denying to Palmers & Co. the preference which they claim over other creditors.

I am of opinion that so much of the decree of the supreme court as declares the forty-eight notes illegal and void, and directs them to be delivered up to be cancelled, should be affirmed, and that the residue of the decree [—unless the clauses which relate to the special receivers, John J. Palmer and Fisher Howe should be excepted—] should be reversed ; and that a decree should be made declaring the trust deed, the further agreement following the deed, and the several separate assignments of the securities mentioned in the schedule to the deed, illegal and void, and requiring them to be delivered up to be cancelled. The trustees must assign and deliver to the receiver all the securities which yet remain in their hands ; and render an account, and pay over to the receiver all the moneys and other things which have come to their hands under the trust, except what they may have paid over to the Palmers. If any thing has been received by the Palmers under the trust, they must account, and pay over the same to the receiver.

The decree must be so drawn up as not in any manner to affect the question whether Palmers & Co. are creditors of the bank.

Such are my views of the case, and such is the judgment of the court.

Ordered accordingly.