### UPTON, ASSIGNEE, *v.* TRIBILCOCK.

1. The original holder of stock in a corporation is liable for unpaid instalments of stock, without an express promise to pay them; and a contract between a corporation or its agents and him, limiting his liability therefor, is void both as to the creditors of the company and its assignee in bankruptcy.
2. Representations by the agent of a corporation as to the non-assessability of its stock, beyond a certain percentage of its value, constitute no defence to an action against the holder of the stock to enforce payment of the entire amount subscribed, where he has failed to use due diligence to ascertain the truth or falsity of such representations.
3. The word "non-assessable" upon the certificate of stock does not cancel or impair the obligation to pay the amount due upon the shares created by the acceptance and holding of such certificate. At most, its legal effect is a stipulation against liability from further assessment or taxation after the entire subscription of one hundred per cent shall have been paid.
4. Assuming the representations of the agent of the company, as to the non-assessment of the stock, to be a fraud which would avoid the contract, the question arises, whether the defendant discharged his duty in discovering the fraud, and repudiating the contract on that account, and not on account of another fraud not in issue. *Held*, that the plaintiff was entitled to the opinion of the jury on that precise question.

ERROR to the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

*Mr. C. C. Nourse* for the plaintiff in error.

*Mr. George G. Wright* for the defendant in error.

MR. JUSTICE HUNT delivered the opinion of the court.

Two points are presented in this case. Upon the first point, the facts are as follows: —

The plaintiff, as assignee of the Great Western Insurance. Company, a corporation organized under the statute of the State of Illinois, brought his action against the defendant, alleging that he was a stockholder of said corporation to the amount of ten thousand dollars; that twenty per cent only had been paid upon his stock; alleging also the bankruptcy of the company, the appointment of the plaintiff as assignee, and the demand of the amount claimed, and seeking to recover the eight thousand dollars remaining unpaid. The complaint averred that the defendant did verbally agree to become such stockholder, and, with intent to become such, did accept a certificate for the

same, whereby he became bound to pay the full amount thereof, as follows: Five per cent upon delivery of the certificates; five per cent in three months; five per cent in six months; five per cent in nine months; and the residue whenever called for by the company, according to the charter of the company and the laws of the State of Illinois.

The defence is, that the subscription was obtained by the fraudulent representations of the agent of the company to the effect that the defendant would only be responsible for twenty per cent of the subscription made by him; that afterwards he executed his promissory note for the twenty per cent, and secured the same by a mortgage of real estate; " and that thereupon (in the language of the answer), and pursuant to agreement, said subscription contract was surrendered and delivered up to defendant;" and also in the language of the answer, " that said note was a full payment and discharge of all obligations and personal liabilities of all kinds whatsoever by reason of his contract so made and the relations created by the delivery to him of said certificate, and said note was received in full payment."

In his third amended answer, the defendant avers that he did subscribe for stock on the conditions mentioned; that after that contract was made, and before a certificate was delivered to him, and before executing his note, an agreement was made with Overton on behalf of the company to the effect before stated; and thereupon he made and delivered the note and mortgage which was received by Overton in full discharge and payment of the amount due on his said subscription.

The evidence contained in the bill of exceptions leaves the case substantially as is averred in the pleadings. The defendant offered evidence tending to prove representations that twenty per cent only was required to be paid; that eighty per cent was non-assessable, and created no personal liability; that the agent, Overton, exhibited a blank form of certificate with the word " non-assessable " printed across the face, " being a copy similar to that subsequently filled up and delivered to defendant by Overton." It appears, that, before the defendant made his subscription, a copy of the charter and by-laws had been furnished to him by Overton; and that, in returns made

by the company to the Auditor of the State of Illinois of the amount of "unpaid subscribed capital for which the subscribers were liable," the amount of the defendant's note was included.

The case standing in this position upon the pleadings and the evidence, the plaintiff requested the court to charge the jury as follows:—

2d. That any contract between the company or its agents and the stockholders, limiting their liability as to unpaid instalments of stock, is void as to creditors of the company, and as to the rights of the assignee who represents the creditors in this action.

3d. That if the jury find from the evidence that the defendant, J. D. Tribilcock, became a stockholder of the Great Western Insurance Company in the month of August, 1870, and that he continued to own and hold said stock until after the insolvency of the company in February, 1873, that any representations by any agent of the company at the time defendant became such stockholder as to the matter of his liability for eighty per cent of the stock, or any indorsement on the stock of the word "nonassessable," are wholly immaterial, and constitute no defence to this action.

This request was refused.

It is hardly necessary to argue the proposition, that if the defendant became a holder of shares of the capital of this insurance company to the amount of $10,000, and had paid but twenty per cent thereof, its creditors were entitled to require of him the payment of the eighty per cent remaining unpaid. The acceptance and holding of a certificate of shares in an incorporation makes the holder liable to the responsibilities of a shareholder. *Brigham* v. *Mead*, 10 Allen, 245; *Buff. City R. R. Co.* v. *Douglass*, 14 N. Y. 336; *Seymour* v. *Sturges*, 26 id. 134. The capital stock of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. It is a trust to be managed for the benefit of its shareholders during its life, and for the benefit of its creditors in the event of its dissolution. This duty is a sacred one, and cannot be disregarded. Its violation will not be undertaken by any just-minded man, and will not be per-

mitted by the courts. The idea that the capital of a corporation is a foot-ball to be thrown into the market for the purposes of speculation, that its value may be elevated or depressed to advance the interests of its managers, is a modern and wicked invention. Equally unsound is the opinion, that the obligation of a subscriber to pay his subscription may be released or surrendered to him by the trustees of the company. This has been often attempted, but never successfully. The capital paid in, and promised to be paid in, is a fund which the trustees cannot squander or give away. They are bound to call in what is unpaid, and carefully to husband it when received. *Sawyer* v. *Hoag*, 17 Wall. 610; *Tuckerman* v. *Brown*, 33 N. Y. 297; *Ogilvie* v. *Knox Ins. Co.*, 22 How. 380; *Osgood* v. *Laytin*, 3 Keys, 521; 37 How. Pr. 63, affg. 48 Barb. 463; Gross, Ill. Stat., p. 356, § 16.

We are of the opinion that the alleged representation of the non-assessability of the stock held by him was quite immaterial. It was so held in *Ogilvie* v. *Knox Ins. Co.*, 22 How. 380.

Again: if full effect is given to the evidence of the defendant and to his claim in this respect, it shows this, and nothing more: He became a stockholder under a certificate signed by the president and secretary that he was entitled to one hundred shares of the stock of $100 each, payable five per cent on receipt of the certificate; five per cent in three months; five per cent in six months; five per cent in nine months from date; the time or manner of the payment of the residue not being specified. Upon the face of this certificate were stamped in red ink the figures " $100," and in another place was stamped the word " non-assessable." This certificate he held until the insolvency of the company in 1873 was known to him.

The legal effect of this instrument was to make the remaining eighty per cent payable upon the demand of the company. We see no qualification of this result in the word " non-assessable," assuming it to be incorporated into and to form a part of the contract. It is quite extravagant to allege that this word operates as a waiver of the obligation created by the acceptance and holding of a certificate to pay the amount due upon his shares. A promise to take shares of stock imⁱⁿⁱʳᵗs a promise to pay for them. The same effect results from

an acceptance and holding of a certificate. *Palmer* v. *Lawrence*, 3 Sand. S. C. 761; *Brigham* v. *Mead*, 10 Allen, 245. At the most, the legal effect of the word in question is a stipulation against liability to further taxation or assessment after the holder shall have fulfilled his contract to pay the one hundred per cent in the manner and at the times indicated. We cannot give to it the consequence of destroying the legal effect of the certificate.

Still, again, the representations relied upon as a defence, it will be noticed, were as to the legal effect of the defendant's subscription and certificate. It is alleged that the agent represented, that by the laws of the State of Illinois, and by the charter of this company, the defendant might become a subscriber to the amount of $10,000; and, by means of a certificate to be given to him like that exhibited, he would really be liable only to the extent of one-fifth of his said subscription, and that good lawyers had given their advice to this effect.

There was here no error, mistake, or misrepresentation of any fact. The defendant made the subscription he intended to make, and received the certificate he had stipulated for; and, as there is no evidence to the contrary, it is to be presumed the good lawyers advised as was stated: but, in law, the defendant incurred a larger liability than he anticipated. *Leavitt* v. *Palmer*, 3 N. Y. 19..

He had received, several days before this time, a copy of the charter and by-laws of the company, and then had them in his possession. The twenty-fifth section of the by-laws was as follows: "Every person who shall subscribe for $10,000 of stock, and pay twenty per cent thereof, shall be constituted a director of this company, and shall continue such director so long as he shall retain of such stock an amount equal to $10,000; but such $10,000 shall not be reckoned in the election of other directors."

It was under this section and the succeeding one, authorizing the establishment of a branch in any place where such subscription was made, and by which the defendant became a director and might be president thereof, that the transaction took place.

That the defendant did not read the charter and by-laws, if such were the fact, was his own fault. It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission. *Jackson* v. *Croy*, 12 Johns. 427; *Leis* v. *Stubbs*, 6 Watts, 48; *Farly* v. *Bryant*, 32 Me. 474; *Coffing* v. *Taylor*, 16 Ill. 457; *Slafyton* v. *Scott*, 13 Ves. 427; *Alvanly* v. *Kinnaid*, 2 Mac. & G. 7; 29 Beav. 490.

That a misrepresentation or misunderstanding of the law will not vitiate a contract, where there is no misunderstanding of the facts, is well settled.

In *Fish* v. *Clelland*, 33 Ill. 243, the principle is expressed in these words: " A representation of what the law will or will not permit to be done is one on which the party to whom it is made has no right to rely; and if he does so it is his folly, and he cannot ask the law to relieve him from the consequences. The truth or falsehood of such a representation can be tested by ordinary vigilance and attention. It is an opinion in regard to the law, and is always understood as such." See *Star* v. *Bennett*, 5 Hill, 303; *Lewis* v. *Jones*, 4 B. & C. 506; *Rashall* v. *Ford*, Law Rep. 2 Eq. 750.

The law is presumed to be equally within the knowledge of all parties.

That a stockholder may relieve himself from his liability by proof that he was misinformed as to the effect of his contract when he made it would be a disastrous doctrine.

That a defendant, who could not by contract lawfully relieve himself from liability as a stockholder, can accomplish that result by proof that it was fraudulently represented to him that he could so relieve himself, would be strange indeed. *Ogilvie* v. *Knox Ins. Co.*, 22 How. 380.

The rule, that a mistake of law does not avail, prevails in equity as well as at common law. *Bank of U. S.* v. *Daniel*, 12 Pet. 32; *Hunt* v. *Rousman*, 1 id. 1; 8 Wheat. 174; *Mellech* v. *Robertson*, 25 Vt. 603; *Leant* v. *Palmer*, 3 Comst. 19.

"If ignorance of law was admitted as a ground of exemption, the court would be involved in questions which it were scarcely possible to solve, and which would render the administration of justice next to impossible; for in almost every case ignorance of law would be alleged, and the court would, for the purpose of determining this point, be often compelled to enter upon questions of fact insoluble and interminable." Austin's Jour., vol. ii. p. 172; Kerr, 397.

A statement that the insurance company had consulted with good lawyers, and that their opinion was as stated, should have been clear proof to the defendant that a representation of the law was a matter of opinion only.

We think the judge erred in not charging as was requested.

The facts upon which the second point arises are these: Assuming that fraudulent representations had been made to the defendant respecting his non-liability for the eighty per cent, and that they were of a character that might relieve him from his contract, it was objected that he had not used proper diligence in discovering the fraud and in repudiating his contract. The transaction took place in August, 1870; and the defendant himself gave evidence "that he never suspected any liability as to said eighty per cent, or that the said representation as to the laws of Illinois were false, until the agent of the assignee made a demand upon him for the eighty per cent in the year 1873; and that, as no claim had been made upon him, he never made any investigation as to the truth of such representations until after said demand in 1873." In February, 1871, the defendant did ask for a rescission of his contract, on the untenable ground that it had been fraudulently represented to him that his note should be retained and held in Bloomfield, Iowa; which representation had been violated by a sale of the same, and a removal thereof to the city of Chicago. The defendant is explicit and emphatic in his evidence that this attempted repudiation "was based wholly on what was represented" as to the intended disposition of the notes and mortgage.

The plaintiff thereupon requested the court to charge the jury as follows: —

"7. That if he, defendant, offered to surrender his stock to the officers of the company, but not upon the ground that he had been

induced to subscribe for the stock upon a fraudulent representation as to his liability for the eighty per cent, but upon another ground, — to wit, that the company had sold and assigned his note and mortgages, — then such offer is immaterial, and the evidence of fraud in such misrepresentations as to his liability for the eighty per cent cannot be made available in this suit, and constitutes no defence in this action.

"12. That if defendant was induced, in August, 1870, to become a stockholder of the Great Western Insurance Company by a representation of the agent of the company that eighty per cent of the stock was non-assessable, and that the laws of the State of Illinois allowed the company to make such contract with those who took stock, then it was the duty of the defendant to use reasonable diligence to ascertain the truth of such representations, and to ascertain what the law of Illinois was on that subject; that if he did not do so within a reasonable time, and did not ascertain the truth of said matter until after the insolvency of the company in 1873, then he cannot, as to the creditors of the company, maintain any defence by means of such representations. The court instructs you, as matter of law, that the defendant could have ascertained the truth of such representations within a few months from the time they were made, and that not doing so is negligence on the part of the defendant that bars such defence as to the assignee."

The defence arising from the alleged promissory representations that the note and mortgage of the defendant should not be removed from Bloomfield, but should be retained in charge of the branch of the company at that place, was frivolous, and was practically abandoned on the trial. The case was submitted to the jury solely on the question arising upon the representations of the non-assessability of the eighty per cent. The attempted rescission on account of the representation as to non-removal and its violation was, however, unfortunately introduced into the charge in a manner that prejudiced the right of the plaintiff.

The requests as above stated were declined; but the judge charged the jury as follows: That, "as respects creditors, the law requires of one, who has been drawn by fraud into the purchase of stock, that he shall be guilty of no negligence or want of reasonable care in discovering the fraud, and, on discovering it, promptly repudiating the purchase. If you find from the

evidence, that, within a few months after receiving the stock certificate, the defendant, discovering that he had been deceived in *some respects*, procured the agent who had obtained his certificate to go to Chicago, delivering to such agent his stock certificate, and instructed the agent to surrender up the stock and demand back the note for twenty per cent; and if the agent accordingly went to Chicago, and offered to the company to surrender the stock and rescind the contract, which the company refused; and if you find that the defendant never afterwards acquiesced in being a member of the company; that in September, 1871, he brought an action of replevin for the note, based on the ground of fraud; and if afterwards he refused to receive any dividend; and if all this took place before bankruptcy or insolvency of the company, — I instruct, that, in point of law, this is a sufficient repudiation of the contract to become a stockholder to enable defendant, living in another State, to resist an action for the payment of the eighty per cent, provided you find that defendant was induced to become a stockholder by fraud, as before explained; and also further find, in view of all the circumstances, that defendant was not unreasonably negligent in discovering the fraud, and was guilty of no want of reasonable diligence in taking steps to repudiate the transaction."

To this charge the plaintiff excepted.

The general principles set forth in this charge are no doubt sound. If the alleged promissory representation as to the non-removal of the note had been available, and had the question been submitted to the jury, the charge would have been well enough. But that question was not before them. The questions submitted to them related exclusively to the representations that the eighty per cent should not be required to be paid. That was the fraud before the jury; and the question involved in the seventh and twelfth requests was this: Assuming that representation to be a fraud which would avoid the contract, had the defendant discharged his duty in discovering that fraud, and repudiating the contract on account of that fraud, and not on account of another fraud not now in question? We think the plaintiff was entitled to the opinion of the jury on that precise question. The charge refused him this right.

The jury were charged, that if, within a few months after receiving the certificate, the defendant, discovering that he had been deceived in some respects, sent an agent to Chicago to surrender his certificate and demand his note, if he never afterwards acquiesced in being a member of the company, if he brought an action of replevin for the note, and if he refused to receive a dividend, this was sufficient evidence of repudiation. This was well enough as to the abandoned fraud which was not before the jury, but was entirely inapplicable to the fraud that was before them. As to that fraud, the defendant testified that he had no knowledge or suspicion of its existence until after the demand made upon him in 1873 by the assignee, and that he never made any investigation as to the truth of the representation as to the eighty per cent liability until after said demand in 1873. On this point there was no contradictory evidence. It should have been ruled as a question of law. *Pettibone* v. *Stevens*, 15 Conn. 19; *Beers* v. *Bottsford*, 13 id. 146. The submission should have been made, if not ruled as a question of law, on these facts only, as requested; and the failure to do so, and the introduction of the facts tending to show a repudiation on the ground of another fraud, could not fail to confuse the jury, and was error on the part of the judge.

*Wright's Case* (Law Rep. 12-Eq. 1871, pp. 331–351) is an authority on this point. It was there held, first, that, under the English act, a surrender and cancellation of shares did not relieve the holder from his liability to creditors of the bank; and, second, that a surrender by Wright of his shares in November, on the ground of an apprehended difficulty in the affairs of the bank, did not enable him to claim a rescission of his subscription on account of a fraudulent representation in the prospectus of the company, which fraud was then unknown to him. *Henderson* v. *Royal British Bank*, 7 E. & B. 356; *Parris* v. *Harding*, 1 C. B. N. S. 533; *Oates* v. *Turquand*, L. R. 2 Ap. Cas. 325.

The principle laid down in the charge of the judge, that one who claims to have been drawn into a fraudulent purchase must exercise care and vigilance to discover the fraud, and must be prompt in repudiating his contract on the ground

of such fraud, is a sound one.    *Thomas* v. *Barton*, 48 N. Y. 193.

The defendant sought to become a member of a corporation of the State of Illinois, and to obtain the benefits and advantages of its special privileges.    If he is not held to be bound to know and accept all the consequences of this connection, he certainly is bound to use care and attention to ascertain his position, and promptly to make his choice of retaining it with its advantages and responsibilities, or of abandoning it.    To subscribe for stock in a corporation in August, 1870, to rest quietly until the year 1873, never making any investigation as to the position in which he stood until that time, and until after the assignee in bankruptcy had made a demand upon him, falls very far short of what the law requires.    Especially is this the case when it is shown that he lived in an adjoining State; that he sent an agent to Chicago, and himself went to that city in 1871 to obtain his note and mortgage from that very company for an alleged misconduct in another respect.    It was his plain duty to have inquired and to have ascertained his position long before he did.    " A party must use reasonable diligence to ascertain the facts."    *Buford* v. *Brown*, 6 B. Mon. 553.

Mere lapse of time, where a party has not asserted his claim with reasonable diligence, is a bar to relief.    Relief is not given to those who sleep on their rights.    *Beckford* v. *Wade*, 17 Ves. 87–97 ; *Jones* v. *Tuberville*, 2 Ves. Jr. 11.

Equity will not assist a man whose condition is attributable only to that want of diligence which may be fairly expected from a reasonable person.    *Duke of Beaufort* v. *Neald*, 2 Cl. & F. 248–286.

Parties who are shareholders, and claim to be relieved on the ground of fraud, must act with the utmost diligence and promptitude.    *Smith's Case*, L. R. 2 Ch. Ap. 613; *Denton* v. *MacNeil*, L. R. 2 Eq. 532; *Peel's Case*, L. R. 2 Ch. Ap. 684.

*The judgment must be reversed, and a new trial had.*

MR. JUSTICE MILLER (with whom concurred MR. CHIEF JUSTICE WAITE and MR. JUSTICE BRADLEY) dissenting.

I am of opinion, that, where an agent of an existing corporation procures a subscription of additional stock in it by fraudu-

lent representations, the fraud can be relied on as a defence to a suit for the unpaid instalments, when suit is brought by the corporation; and that if the stockholder has in reasonable time repudiated the contract, and offered to rescind before the insolvency or bankruptcy of the corporation, the defence is valid against the assignee of the corporation.

I also think there was evidence of such fraud in this case, and that the question of reasonable diligence in the offer to rescind was fairly put to the jury by the Circuit Court.