WINTERS *v.* ARMSTRONG. ARMSTRONG *v.* STANAGE. SAME *v.* WOOD.

(*Circuit Court, S. D. Ohio, W. D.* January 28, 1889.)

1. BANKS—NATIONAL BANKS—INCREASE IN CAPITAL—LIABILITY OF SUBSCRIBER.
National banks have no authority to increase their capital stock except as provided by Rev. St. U. S. § 5142, and act Cong. May 6, 1886; and where an increase is attempted to be made without obtaining the consent of two-thirds of the stock, the payment in full of the amount of such increase, and the certificate and approval of the comptroller of the currency, as required by those statutes, the proceedings are invalid, and preliminary subscriptions to such increase cannot be enforced.

2. SAME.
Such a subscription is impliedly conditioned on the subscription of the whole amount of the proposed increase, and on the compliance by the corporation with all the requirements of the statute necessary to make the increase stock valid. And in case of non-compliance with such requirements there is a failure of consideration.

3. SAME—ESTOPPEL.
In an action by the receiver of a national bank to enforce subscriptions to a proposed increase of its capital stock, an allegation that the bank, subsequent to defendants' subscriptions, and with their knowledge, represented to the public by means of circulars, letter-heads, etc., that its capital stock had been so increased, and that defendants allowed their names to remain "upon the list of those subscribing for and entitled to such new or increase of stock," but without alleging that the public gave credit to the bank on the faith that defendants were part owners of such increase of stock, or that they

allowed themselves to be held out as actual stockholders, does not show that they are estopped to plead the failure of the bank to comply with the statutory requirements in perfecting such increase.

4. SAME—INSOLVENCY—RECEIVER.

The receiver stands in the shoes of the bank, and can assert no rights against the subscribers which the bank could not have asserted.

5. SAME—MONEY PAID ON SUBSCRIPTION.

A subscriber who has made payments on his subscription to the proposed increase, believing that the statutory requirements would be complied with, is entitled to have the amount thereof allowed as a claim against the assets of the bank in the receiver's hands.

In Equity. On demurrer and exceptions.

In the first of these three actions J. H. Winters is plaintiff, and David Armstrong, receiver of the Fidelity National Bank, is defendant, and in the two others the receiver is plaintiff, and W. H. Stanage and William Wood, respectively, are defendants.

*E. W. Kittredge* and *W. B. Burnet*, for the receiver.

*Paxton & Warrington*, for J. H. Winters and W. H. Stanage.

*Jordan & Jordan*, for William Woods.

JACKSON, J. These three cases, standing on exceptions to the answer of the receiver in the first, and demurrers to his replies in the second and third of the above-entitled causes, present substantially the same questions, and, having been heard together, will be considered and determined together. The material facts disclosed in the pleadings, and on which the legal questions arise, are the following, viz.: The Fidelity National Bank of Cincinnati was organized in February, 1886, with a capital stock of $1,000,000, which "its articles of association" provided might be increased, according to the provisions of section 5142, Rev. St., to any sum not exceeding $3,000,000. Said section 5142, in force when the bank was organized, provides that "any association formed under this title may, by its articles of association, provide for an increase of its capital, from time to time, as may be deemed expedient, subject to the limitations of this title, but the maximum of such increase to be provided in the articles of association shall be determined by the comptroller of the currency, and no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the comptroller of the currency, and his certificate obtained, specifying the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as part of the capital of such association." By an act of congress approved May 6, 1886, it is provided that "any national banking association may, with the approval of the comptroller of the currency, by the vote of shareholders owning two-thirds of the stock of such association, increase its capital stock in accordance with existing laws to any sum approved by said comptroller, and no increase of the capital stock of any national banking association, either within or beyond the limit fixed in its original article of association, shall be made except in the manner herein provided." After this act of May, 1886, went into operation, the directors of the Fidelity National Bank, in March, 1887, passed a resolu-

tion that the capital stock of said bank be increased $1,000,000; that said increase of stock be furnished to the shareholders in like proportion to the amount of their holdings of original stock, at the rate of $135 per share of $100; and that shareholders should be notified of the board's action, so as to give them the opportunity and prior right to subscribe for such increased stock. Thereafter, in April and May, 1887, the plaintiff, Winters, and the defendants, Stanage and Woods, as holders of original stock of the bank, subscribed for such proposed increase of its capital stock, in proportion to their respective holdings of the old stock. Winters paid in his subscription in two cash installments made in April and May, 1887, taking from the bank a receipt or rec ipts therefor, specifying the number of shares of the new stock which were to be issued to him by the bank when the increase was made. Woods and Stanage each executed notes to the bank for the amounts of their respective subscriptions to the proposed increase of stock payable at four months and ninety days from April 7, 1887, but neither paid in any money on their subscriptions or their notes. No certificates of stock on the proposed increase were issued to Woods or Winters, but one was issued to Stanage; but it does not appear that either of them ever voted such stock, or accepted any dividends thereunder. The bank was in fact insolvent when this increase of the stock was proposed by the directors, and the subscriptions were made in the belief that the bank was solvent, and that the new stock was or would be worth what the subscribers agreed to pay for it.

It does not appear from the answers and replies of the receiver, which are excepted and demurred to, that this proposed increase of the capital stock of the bank was sanctioned or authorized by the vote or approval of shareholders owning two-thirds of the stock of the association; and it is conceded that no steps were taken by the bank to perfect the proposed increase of stock in conformity with the provisions of the national banking laws. No notice of the proposed increase of its capital stock was given, either by the association, its directors, or stockholders, to the comptroller of the currency; nor was such proposed increase of stock ever assented to or approved by said comptroller; nor was any certificate ever issued by or obtained from the comptroller, specifying the amount of such increase of the bank's capital stock, or that it had been duly paid in as part of the bank's capital. It is conceded in the pleadings of the receiver, and by his counsel in argument, that no valid increase of the capital stock of the bank was ever in fact made in conformity with the requirements of the national banking laws. This is manifestly so under the admitted facts. Corporations have no power to increase or diminish their stock unless expressly authorized so to do. It is also well settled that the directors of a corporation cannot, in the absence of power expressly conferred, make any valid increase of its capital stock. In *Railway Co.* v. *Allerton*, 18 Wall. 233, the charter of the corporation provided that its capital stock should be a designated sum, "and may be increased from time to time, at the pleasure of the said corporation." It was held that the directors alone could make no valid increase of the stock of the

corporation. Directors of national banks have no authority under the law to increase the capital stock of such associations; nor can the assent of individual shareholders or subscribers for such new stock to their action in attempting so to do confer the requisite authority, or make such increased stock valid, under the provisions of section 5142, Rev. St., or of the act of May, 1886, above quoted. It is not material to determine how far, or to what extent, the latter act either modifies or repeals the provisions of section 5142, Rev. St., for under neither can it be properly claimed that the proposed or attempted increase of the capital stock of the Fidelity National Bank was made in a way to give it any legal validity, or to confer upon the subscribers therefor any rights as actual stockholders of the association. In *Delano* v. *Butler*, 118 U. S. 649, 7 Sup. Ct. Rep. 44, Mr. Justice MATTHEWS, speaking for the court, says that, under section 5142 of the Revised Statutes, three things must concur to constitute a valid increase of the capital stock of a national banking association, viz.:

"(1) That the association, in the mode pointed out in its articles, and not in excess of the maximum provided for by them, shall assent to an increased amount; (2) that the whole amount of the proposed increase shall be paid in as part of the capital of such association; and (3) that the comptroller of the currency, by his certificate specifying the amount of such increase of capital stock, shall approve thereof, and certify to the fact of its payment."

These several requirements were not complied with by the Fidelity National Bank. There was no formal or proper assent of the association to the proposed increase. The whole amount of such increase was not paid in as a part of the capital of the association. No notice of the proposed increase was given to the comptroller of the currency. The comptroller never approved such increase, and never issued any certificate specifying the amount of such increase, with his approval thereof, nor certified to the fact of its payment. It is equally clear that there was no compliance with the provisions of the act of May, 1886. Under that act an increase of the capital stock of any national banking association, either within or beyond the limit fixed in its original articles of association, can only be legally and validly made with the approval of the comptroller of the currency, and with the assent or by the vote of shareholders owning two-thirds of the stock of such association; and such increase must also be made "in accordance with existing laws to any sum approved by said comptroller;" and, except in the manner thus provided and prescribed, the act declares that no increase "shall be made." As repeals by implication are not favored, and as the act of 1886 is not in conflict or inconsistent with the second and third requirements under section 5142, Rev. St., "that the whole amount of the proposed increase shall be paid in, and that the comptroller, by his certificate specifying the amount of such increase of capital stock, shall approve thereof, and certify to the fact of its payment," it follows, as we think, that such payment and certification by the comptroller are still required under the act of 1886, in order to make the increase of capital stock "in accordance with existing laws." These acts of congress constitute the charter

powers of national banking associations in respect to an increase of their capital stock. The act of 1886 makes the matter or subject of an increase in their capital stock conform to that of a reduction of such capital stock, as provided for by section 5143, Rev. St. The general government, under whose laws national banking associations are created, and their powers defined, has, in and by these provisions of the law, reserved to itself to say, through its designated agent or officer intrusted with the supervision of such matters, when and to what extent such associations shall be allowed to increase or diminish their capital stock, and thus effect radical and fundamental changes in their organization. In and of themselves national banking associations are invested with no power or authority to increase or diminish their capital stock. No such increase or diminution of their capital stock can be legally made by them without first obtaining the direct and positive sanction of the government, expressed and certified by the approval of its comptroller of the currency. Every application for such an increase or diminution of their capital stock is equivalent to a request for an amendment of their charter powers in that respect; and all attempts upon their part to effect an increase of their stock without the sanction or approval of the sovereign, signified in the mode and manner provided by law, are destitute of authority, and wholly wanting in legal validity.

New subscribers to the capital stock of national banks, whether at their original organization or subsequently, upon a contemplated increase of their capital stock, clearly enter into an agreement or undertaking based upon the charter powers of such associations; and the rights and obligations of such subscribers rest and must be determined upon the conditions and law of the charter, as embodied in the banking legislation of congress. Whatever conditions are imposed by the law upon such associations as a prerequisite or condition precedent to the acquisition of the power and authority necessary to the issuance or creation of valid stock must be performed before the subscription contract can be enforced either on behalf of the association or of those claiming through or under it. The general principle is well settled that subscriptions to the capital stock of corporations are made upon the implied condition that valid stock, such as will confer upon the subscriber all the rights and privileges of a stockholder, is to be issued. The subscription promise rests upon this condition and understanding on the part of the corporation, and until the corporation is in position to comply with this condition there is no enforceable liability against the subscribers for its stock. In the present case, so far as disclosed by the pleadings, the subscriptions made by Winters, Stanage, and Woods to the proposed increase of the capital stock of Fidelity National Bank conferred no right, and imposed no duties upon them or either of them, except to become stockholders to the extent of their respective subscriptions, when the increase became valid, and imposed no obligation upon the bank except to admit them as stockholders when the proceeding was complete, and the bank was in position, invested with the requisite power, to issue them valid stock. The subscriptions, the payment or execution of notes for the amount thereof, the

taking of receipts or certificates therefor, and the entry of their names upon the stock-books or ledger for the amounts respectively subscribed for, which they proposed to take, were merely preparatory or preliminary steps taken in anticipation of becoming actual stockholders when the whole amount of the proposed increase should be subscribed, and the approval and certificate of the comptroller obtained. Before completing the proceeding, and before obtaining the approval and certificate of the comptroller, which was requisite and essential to confer the power and authority to make the proposed increase, the association, which was actually insolvent when the initial step looking to an increase was first taken, was closed on June 21, 1887, by the officers of the government, and its assets soon thereafter placed in the hands of a receiver, and its franchises forfeited. So that the association has not complied, and cannot comply, with its obligation to issue to those subscribers any valid stock on their several subscriptions. It never was in a position to do so from the time the subscriptions were made until its corporate existence and franchises ceased and determined by insolvency and forfeiture. Not only was no valid stock either issued or capable of being issued by the association to those subscribers, but it is not alleged or averred in the receiver's pleadings, which are demurred and excepted to, that the whole amount of the proposed increase of capital stock was ever in fact subscribed for. In the pleadings of Winters, Stanage, and Wood it is alleged that it was not. As a necessary sequence from the general principle that subscriptions for stock in a corporation are to be governed by the terms and conditions contained in the charter which confers the corporate existence, and defines its powers, it is settled that where the amount of the capital stock is fixed by the charter, or by the agreement of the subscribers, or by the directors, where the law or charter confers upon them the authority to fix it, a contract to subscribe for stock so fixed is impliedly conditioned on the subscription of the whole amount, and until this condition precedent is complied with, subscribers cannot be legally called upon to pay, or respond to calls or assessments upon their subscriptions. In such cases the subscription contract has imported into it, as fully as though recited in the subscription paper itself, the condition that the several subscribers are to be admitted to the character of shareholders when the whole amount should be subscribed. This rule applies to increases of capital stock as well as to the original subscriptions in cases where the proposed increase is fixed and designated. Subscribers may, however, waive performance of this condition; and in some of the cases it is held to be waived when the subscriber, knowing that the whole amount of such capital stock has never been subscribed for, nevertheless participates in the affairs of the corporation in a manner which would have been proper only on the assumption that the shareholders intended to carry on business with the stock but partially subscribed.

On one branch of the case, *Delano* v. *Butler*, 118 U. S. 647–651, 7 Sup. Ct. Rep. 39, is an illustration of such a waiver by the subscribers. In that case the proposed increase of the capital stock was $500,000. The increase actually made and approved by the comptroller of the currency

was $461,300, the amount actually paid in. After this increase was regularly made, the subscriber acted as a stockholder of the reduced amount, was affected with a knowledge of the change, and participated in meetings of the stockholders, and in the affairs of the association, in a way to show or satisfy the court that he had acquiesced in the reduction of the proposed increase from $500,000 to $461,300, and was accordingly held, as a stockholder on his subscription, which was paid in, and formed a part of the actual increase approved by the comptroller. The decision of the court in the case of *Delano* v. *Butler* is not in conflict with the case of *Eaton* v. *Bank*, 144 Mass. 260, 10 N. E. Rep. 844, where the court held the subscriber for stock discharged by a change in the amount of the proposed increase, made without his knowledge or consent thereto, express or implied. In this latter case the court say:

"The vote of the directors of September 13, 1881, was, we think, in the nature of a proposal to the stockholders to subscribe for five thousand shares of new stock, and to pay in for it $500,000. It was necessary that the stock should all be taken, and the money all paid in, before the new stock could be created. It was a condition precedent to the issue of the new stock under this vote that both those things should be done and that the comptroller should certify that they had been done, and approve the increase."

The rule here laid down is directly applicable to the present case. The proposed increase to which Winters, Stanage, and Woods made their respective subscriptions was $1,000,000. To render their subscriptions binding upon them it was necessary that the whole of the proposed amount should be taken and paid in before the new stock could be created. Those requirements, together with the comptroller's approval of said increase, and his certificate thereof, and of the fact of its payment, were conditions precedent to any legal liability on the part of said subscribers; for until they were performed there was not, and could not be, any legal or valid increase of the stock which was to constitute the consideration moving from the bank for the subscriptions made, whether the same were paid or only promised to be paid. There is no claim made by the receiver, in his pleadings, that these conditions—all or any of them—have been waived by these subscribers, so as to bring this case within the rule laid down in *Delano* v. *Butler*, and kindred authorities. Until there had been an approval by the comptroller of the currency of such increase, or of some portion thereof, it is difficult to see how there could have been any waiver on the part of these subscribers which would render them liable as stockholders before they had acquired, or could possibly acquire, the new valid stock, in whole or in part, for which they subscribed.

Woods and Stanage are sued by the receiver on their notes executed to the bank for the amounts of their respective subscriptions, and pleaded want or failure of consideration, because no valid stock under the proposal made to them by the bank has been or can be issued and delivered to them. Winters seeks to recover the amount of his deposit made on his subscription, or to have the amount thereof recognized as a legal claim against the bank and its assets in the hands of the receiver. Against

this claim of Winters, and the defense relied on by Stanage and Woods, the receiver sets up an estoppel, based upon the ground that, although the Fidelity Bank did not comply with the conditions on which the subscriptions were made, or take any steps towards securing the right and power to issue the new stock, and never in fact acquired the necessary authority to make the proposed increase, nevertheless it held itself out to the public, with the knowledge of said parties, as having in fact increased its stock $1,000,000, and that by such representation said subscribers are now precluded from disputing their position and liability as actual stockholders. The estoppel set up and relied on is pleaded as follows:

"That thereafter, on and after the said 7th day of April, 1887, the said Fidelity National Bank proceeded to announce, and did announce and publish, to the public, and to the creditors and others dealing with, or about to have dealings with, said Fidelity National Bank, by means of circulars, and statements upon the letter-heads and other stationery of the said Fidelity National Bank, that the said capital stock of the said Fidelity National Bank was at such time or times two millions of dollars, ($2,000,000,) which was the amount to which it was proposed to increase the stock, and to the increase of which, and as part thereof, the said defendant had theretofore subscribed; and the said bank at such times as aforesaid, by advertisement in each and all of the daily newspapers published in Cincinnati, and otherwise, held itself out to the said public and said persons as above described, as having then and there a capital stock of two millions dollars ($2,000,000) with full knowledge thereof on the part of said defendant; all of which matters and things were well known to the defendant, who thereafter, and with such knowledge, remained and allowed his name to remain, and his name did remain, upon the list of those subscribing for and entitled to such new or increase of stock; and defendant remained and was the owner of said receipt, and of said share of stock, and so remained at the time the said Fidelity Bank failed and passed into the hands of the receiver as alleged in the said answer herein."

This plea, setting up acts and representations of the association, whose officers and agents were the trustees and representatives of the rights and interests not only of the bank, but of both actual shareholders and creditors, is wanting in several essential particulars necessary to create or raise an estoppel *in pais*, such as will conclude subscribers for stock, who were not and could not be represented by the bank or its officers in any sense until they became and were entitled to the rights and privileges of actual stockholders. Estoppels are allowed for the prevention of fraud and damage to innocent parties when it is shown that the person against whom they are invoked has done acts or made declarations or representations intended or calculated to influence the conduct of others to whom they are made, and when they have in fact and truth influenced the conduct of others in such manner as will prejudice them, if the party doing the acts or making the representations is allowed to dispute their correctness. These circumstances must concur in order to create an estoppel *in pais*. As stated by a learned judge: "The declarations or representations by which a party is to be concluded must be made either with a knowledge of the facts upon which any right he may have depends, or with intent to deceive the other party; and they must have, in truth,

influenced the conduct of such other party in a manner that will result in loss or damage or prejudice to him, if the party making them is permitted to retract." The receiver's plea does not aver that the public or creditors or those dealing with the bank were in any manner misled or deceived by its representations as to the amount of its capital stock. It is not averred that the public or creditors dealt with or trusted the association on the faith that Winters, Stanage, and Woods were part owners of such increased capital; there were no such representations. Nor is it alleged that any representation was made to the effect that the comptroller of the currency had approved and certified to the increase, as required by law, in order to give it validity. The public and all parties dealing with said bank are chargeable with notice of the bank's want of power to increase its capital stock at will, and by its own action; and the means were open to ascertain the fact. The officers of the bank, who made such representations as to the increase of its capital stock, would no doubt be liable to any and all parties who acted upon them in good faith, and trusted the bank or dealt with it, to their prejudice and damage, under the belief thus created that its capital stock was $2,000,000; but the liability of such officers would rest upon the ground of fraud committed by them in making statements that were intended or calculated to mislead and deceive, and which influenced the conduct of those who trusted the bank upon the faith of such statements, and were thereby injured. This liability of the officers making the false representations would in no way depend upon their relation to the bank as stockholders, or be measured by the amount of their holdings of stock; nor would it in anywise be affected by the fact that they were subscribers for the new stock. It is not averred in the plea that the subscribers for the increased stock, whose contract with the association amounted to nothing more than a proposition or proposal to take certain amounts of such new stock when it could be and was lawfully issued by the association, were ever held out to the public or to those dealing with the bank as actual stockholders; it is merely alleged that said subscribers allowed their names to remain, and that they did remain, "upon the list of those subscribing for and entitled to such new or increase of stock." Upon what principle can the wrongful act of the association in falsely representing that it had increased its capital stock $1,000,000 convert the subscriber for a portion of such new stock into an actual stockholder, so as to impose upon him the burdens, and subject him to the same liability as would have arisen if the association had fully performed its agreement by issuing to him valid stock? How is the association's undertaking, obligation, and duty to issue valid stock under the subscription contract dispensed with by its action in fraudulently representing to the public that its capital stock was increased to $2,000,-000? Does such a false representation, made in respect to a matter not lying within the power of the association, operate in favor of the public or those thereafter dealing with the bank, so far as the subscribers for such new stock are concerned, as a performance by the association of the conditions on which alone such subscribers could ever become actual stock-

holders, and subject to the liability attaching to that relation? There can be but one answer to such a proposition. The fact that the subscribers interested in these suits were original stockholders of the association is not at all material. In respect to the new stock for which they subscribed they stand upon the same footing as entire strangers to the bank. In respect to their subscriptions for the proposed increase of stock they sustain merely contractual relations to and with the association. The reciprocal duties and obligations arising from these contract relations it was not in the power of the bank by fraudulent representations or otherwise to affect; and until valid new stock was properly and lawfully issued to such subscribers they did not become stockholders, either as to the association or as to those dealing with it, nor did the association act as their agent, or have authority to make representations binding upon them or operative to conclude them from showing that they were never in fact stockholders. While occupying the position of mere subscribers for new stock, they could not have restrained or controlled the action or representations of the association. If they actively participated with the officers of the association in making false and fraudulent representations about the bank, which deceived others, and led them to treat or deal with it to their injury, they could be held liable for such fraud wholly independent of any character of stockholders, No such question is here presented These subscribers are sought to be held liable. or denied relief, on the theory that under the operation of some rule of estoppel growing out of the acts of the association their relation to the bank has been changed from that of subscribers for new stock to that of actual shareholders of such new stock.

The cases cited and relied on by counsel for the receiver do not sustain the position for which they contend. The cases referred to undoubtedly support the general proposition that a stockholder is estopped from denying that the corporation has been legally organized, and from setting up and relying upon irregularities and informalities on the part of the corporation in making an increase of its capital stock, where it was invested with the power to issue or create new or additional stock. What are known as the *Upton Cases,* viz., *Upton* v. *Tribilcock,* 91 U. S. 45; *Sanger* v. *Upton,* Id. 56; *Webster* v. *Upton,* Id. 65; *Chubb* v. *Upton,* 95 U. S. 665, and *Pullman* v. *Upton,* 96 U. S. 328,—deal only with the cases of subscriptions obtained by fraud, or stock which the corporation had the right or power to issue, but issued irregularly, or stock *de facto* in corporations irregularly organized. They establish the rule that in the organization of corporations, and in the exercise or execution of admitted powers, irregularities and informalities occurring in the corporate action will not avail stockholders as a defense against creditors or receivers representing the rights of all concerned. But these cases do not meet the questions here presented, for the reason that national banking associations do not possess the power of increasing their capital stock, and because, in respect to the subscriptions in question, irregularities or informalities in the execution of an existing authority are not relied on as a defense, but the want or absence of power on the part of the association to com-

plete in a lawful and valid way the increase which its directors proposed to make. The distinction between the want or lack of power to do the contemplated act and irregularities in the exercise of an admitted authority or actual power is clearly pointed out in the case of *Scovill* v. *Thayer*, 105 U. S. 143, where it was held that stock issued in excess of the corporation's power was void, and conferred no right and imposed no obligation or liability on the holder of such stock, who was not estopped by receiving certificates for such unauthorized stock, by attending corporate meetings, or by the fact that the corporation had held itself out as having increased its capital, and thus obtained increased credit. Upon the questions under consideration the supreme court, speaking by Mr. Justice Woods, say:

"We think that he (the subscriber) is not estopped to set up the nullity of the unauthorized stock. It is true that it has been held by this court that a stockholder cannot set up informalities in the issue of stock which the corporation had the power to create. *Upton* v. *Tribilcock*, 91 U. S. 45; *Chubb* v. *Upton*, 95 U. S. 665; *Pullman* v. *Upton*, 96 U. S. 328. But those were cases where the increase of the stock was authorized by law. The increase itself was legal, and within the power of the corporation, but there were simply informalities in the steps taken to effect the increase. These it was held were cured by the acts and acquiescence of defendant; but here, the corporation being absolutely without power to increase its stock above a certain limit, no acquiescence of the shareholder can give it validity or bind him or the corporation."

While the question presented in *Scovill* v. *Thayer* did not arise under the national banking laws, so as to make that decision directly in point, and conclusive of the present case, the principle there announced, and the distinction there drawn between informalities in steps taken by the corporation which do not invalidate, and the want of power which does invalidate, an increase of its capital stock, is applicable to the case at bar, which involves the question of power on the part of the association to make the proposed increase by any action of its own. In the *Scovill Case* the corporation had authority of law by its own act to increase its capital stock, but was restricted and limited as to the amount of such increase. When it passed that limit, and issued stock in excess of its prescribed authority, such excess of stock was wholly wanting in legal validity; and no action on the part of the corporation, or acquiescence of the subscriber, could operate to give it validity, by way of estoppel or otherwise, even in favor of creditors. National banking associations have no authority of law by their own action to increase their capital stock to any amount whatever. They can make no increase to any extent, without the approval of the comptroller as the representative of the government. His approval confers the right to make and fixes the limit or the amount of such increase. Within its own power and by its own action a national bank can make no increase of its capital stock. It might and would doubtless be true that with or after the comptroller's approval of an increase, which involves the exercise of discretion, supervisory on his part, and wholly beyond the control and independent of the action or wish of the association or of its stockholders, the steps

taken or mode of procedure adopted by the bank might not strictly conform to the requirements of the law; that for want of such conformity the action on the part of the association might be illegal; and that the stockholders or subscribers for such stock, who had accepted an allotment of shares thereunder, and acquiesced in the steps taken and the proceedings had by the association in the preliminaries to be performed on its part, would be bound. In effecting an increase of its capital stock the association may, so far as relates to its own action, proceed in an irregular or informal manner, which a stockholder who has acquiesced therein may not, as against either the corporation or its creditors, take advantage of or insist upon as invalidating his subscription, or the stock issued to him thereunder. But in regard to the sovereign's consent to such increase, to be expressed in and by the approval of its comptroller of the currency, that is an essential prerequisite or condition precedent, like a special enabling act, in conferring the power and authority to make the proposed increase valid. Such approval involves the grant of power to complete and perfect the proceedings commenced by the association looking to an increase of its capital stock. It is something lying beyond the action or control of the association and its stockholders seeking to effect an organic and fundamental change in the constitution of the bank; and in respect to this essential thing, in nowise involved in the action or steps taken by the association, the question of irregularity or informality in its own mode of procedure, and the consequences thence resulting, do not apply.

The case of *Veeder* v. *Mudgett*, 95 N. Y. 295, cited and relied on by counsel for the receiver, bears a close resemblance to the present, but when carefully examined it is distinguishable, and not in conflict with the distinction taken in *Scovill* v. *Thayer*, between irregularities and informalities which do not invalidate, and the want of power which does render void, attempted increases of stock, and which, as we think, is applicable to the case under consideration upon the facts disclosed in and by the pleadings. In *Veeder* v. *Mudgett*, as the court asserts and as the statute shows, "the abstract power did exist" on the part of the corporation to make the increase of its capital stock, and there was a way in which the increase could lawfully be made by the corporation's own action, independent of the sanction or approval of any state official. The New York statute under which the corporation acted was substantially like that of the Illinois statute under which the *Upton Cases*, above referred to, arose, and which the supreme court held conferred upon the corporation the power to make the increase of its stock, in the execution of which the irregularities and informalities occurred which were held not to invalidate the stock. In the *Veeder Case*, as in the *Upton Cases*, there was color of compliance with the statutory requirements, which came within the power and the legitimate action of the corporation. The want of conformity to the provisions of the law, relied on as rendering the stock void, were defects committed entirely by the corporation in respect to matters within its own control, and as to which it was invested with full authority. They do not reach the question here presented, where the infirm-

ity does not lie in defective or irregular proceedings on the part of the association in respect to a matter or matters coming within the scope of its own proper action, under the laws, but consists in the want of power to make the proposed increase without the approval of the comptroller. It further appears in the *Veeder* v. *Mudgett* case that the defendants had not only voted for the increase, but accepted their proportions of the increase stock thereunder, took dividends upon it, and held it out to those dealing with the corporation as an actual component of its capital. It was found by the referee that each of the defendants had himself done some act which brought him and them within the range of the estoppel relied on by the creditors, who were directly seeking relief in that suit. In the estoppel set up by the receiver in the present case it is not claimed that Winters, Stanage, and Woods have themselves or either of them done any such acts, nor that any creditor of the association was misled or deceived and thereby injured by what the bank did in representing that its capital stock was $2,000,000, so as to bring the case within the decision in *Veeder* v. *Mudgett*, even conceding its application to the question here involved. In the case at bar the position of the parties is in many respects different from that in the *Veeder* v. *Mudgett* case. Here the relation of the subscribers for the new stock to the association, so far as appears by the pleadings, was not that of actual or even of *de facto* stockholders claiming and asserting the rights and participating in the management of the corporation as such, so as to make or constitute the bank their agent in any proper or even qualified sense. Under and by virtue of their subscriptions they sustained only contractual relations to and with the association, until the bank acquired the authority or power to issue valid stock in compliance with its agreement and undertaking so to do, and allotted to them their respective shares. The association never secured the authority to issue the stock subscribed for, never performed its part of the contract by placing itself in position to issue or by issuing valid stock, but in lieu thereof falsely represents to the public that it has increased its stock to $2,000,000; and this misrepresentation is relied on, not only to effect a change in the relation of the subscribers to the association, but to impose upon them the burdens and obligations of actual stockholders. The authorities brought to our attention do not support such an extension of the doctrine of estoppel, which is never invoked to confer corporate powers. No estoppel can properly arise in any case where the party's direct and affirmative act could not have made the transaction valid. What the Fidelity Bank did in misrepresenting what did not lie within its power or that of its stockholders to do by their own action, cannot, upon any sound principle, be taken and accepted as the equivalent of, or the substitute for, the power it did not possess. Parties deceived or misled to their damage by such misrepresentations must seek relief against those making or responsible for the false statement, as individuals, but cannot look to them in the character of stockholders created under the operation of an estoppel, in the absence of power on their part or that of the association to establish that relation. This conclusion is sound in principle, and is, as we think, supported by the au-

thorities. See *Scovill* v. *Thayer*, 105 U. S. 143; *Charleston* v. *Bank*, 5 Rich. Law, (N. S.) 103; *Page* v. *Austin*, 10 Can. Sup. Ct. 140–170; *Schieronburg* v. *Stephens*, St. Louis Ct. App. (MS. opinion,) decided in November, 1888; *Tube Works* v. *Machine Co.*, 139 Mass. 5–11. The above case of *Schieronburg* v. *Stephens* covers the questions presented in this case, and the facts relied on to create the estoppel and defeat the relief sought were much stronger and fuller than those set up by the receiver in the present suits.

The claim made by one of the counsel for the receiver, that his position as the representative of creditors is better than that of the Fidelity National Bank, and that he can enforce rights on behalf of creditors which would not exist in favor of the association, is not sound, as applied to a case like the present. When the conclusion is reached that Winters, Stanage, and Woods are only to be regarded and treated as subscribers for valid stock which has not been and cannot be issued to them by the association, the receiver cannot, in behalf of either the bank, stockholders, or creditors, enforce against them any right which the association could not itself have asserted. A receiver cannot enforce the payment of subscriptions to stock which the corporation could not have enforced at the time of his appointment. *Cutting* v. *Damerel*, 88 N. Y. 410. In respect to contracts of this character the receiver occupies no position superior to that of the bank, for the reason that the corporate management, while in charge of its business, just as much as a receiver after his appointment, represents the interests of all persons, creditors as well as shareholders. When the corporation is insolvent, the rights of creditors in respect to the corporate assets become most prominent, and a receiver appointed to administer or collect such assets is regarded as more directly the representative of creditors. In a certain class of cases a receiver may assert rights which the corporation could not. Thus he may disaffirm illegal and fraudulent transfers of corporate property, and may recover its funds and securities which have been misapplied. The governing officers of a corporation cannot, for example, release a stockholder or a subscriber for its stock from his obligation to pay, to the prejudice of creditors. They cannot return to stockholders the capital stock of the corporation, which constitutes a trust fund for the benefit of creditors, to the injury of such creditors. They can make no fraudulent disposition of the corporate property for their private benefit, or for the benefit of the stockholders, leaving creditors unprovided for. These and like transactions involving the misapplication or fraudulent disposition of corporate property a receiver may disaffirm, and recover such assets for the benefit of creditors, when the corporation might not be in position to do so. *Wood* v. *Dummer*, 3 Mason, 308; *Curran* v. *Arkansas*, 15 How. 304; *Burke* v. *Smith*, 16 Wall. 390; *New Albany* v. *Burke*, 11 Wall. 96, and *Sawyer* v. *Hoag*, 17 Wall. 619,—afford illustrations of the cases in which receivers may assert rights which the corporation or corporate management could not enforce. But the present case involves no such principle. Subscribers to the new stock, which they have not and cannot obtain, are in no sense the recipients of the corporate property or as-

sets which have been fraudulently or wrongfully divested, misapplied, or disposed of, to the prejudice or creditors. The rights and obligations growing out of these subscriptions rest upon contract, and in respect to such matters the receiver stands precisely in the shoes of the association, and can only enforce what it could have enforced at the date of his appointment, and is subject, so far as the assets of the bank are concerned, to the same obligations as the bank would have been under had it continued in existence, and never passed into the hands of the receiver. The Fidelity National Bank could not, under the facts stated, have enforced the payment of the notes executed by Woods and Stanage; neither can the receiver do so. Winters could have recovered his deposit made on his subscription as against the association, and he is entitled to its allowance as a valid claim against the assets of the bank in the hands of the receiver, so far as anything disclosed by the pleadings appears. Subscribers may not in every case recover back deposits paid on subscribing for shares in contemplated corporations, or proposed increases of capital, where the scheme of incorporation or the proposed change proves a failure. In some cases the right of recovery will depend on the meaning and intention of the parties as expressed in the subscription agreement. If, for instance, it appears to have been the intention or understanding of the parties that the deposit made on the subscription should be used and applied towards the furtherance or accomplishment of the scheme, and it is so applied, the subscriber may not be able to recover it upon the failure of the enterprise. When, however, such deposits are made in order to comply with some statutory requirement, and without any intention on the part of the subscribers or right on the part of the corporation to otherwise apply the same, then, upon failure of the scheme, the subscribers are entitled to have their entire deposits returned. The deposit made by Winters on his subscription clearly falls within this latter category, inasmuch as it was made in compliance with the statutory requirement that the money should be paid in before the new stock could be legally issued, and there is no fact or circumstance disclosed in the case to show that he intended to make such deposit with any other intention or for any other purpose.

Our conclusions are, therefore, that the exceptions taken by Winters to the answer of the receiver should be allowed; that the demurrer of Wood to the reply of the receiver in his case is well taken, and should be sustained, and that the demurrer of Stanage to the first paragraph of the receiver's reply to his answer is well taken, and should be sustained. The second paragraph of the receiver's reply to Stanage's answer denies that the note he executed to the Fidelity National Bank, and which is sued on, was delivered to said bank in payment of his subscription to the proposed increase of capital stock, as alleged in his answer. This denial presents a proper, issuable fact, which the court does not understand as being demurred to. Excluding this second paragraph of the reply to Stanage's answer, the exceptions taken by Winters and the demurrers interposed by Woods and Stanage are sustained, and judgments will be entered accordingly in each of the cases, with costs.