### W. L. MACATEE & SONS v. CHAMBERS et al.

No. 9909.

Court of Civil Appeals of Texas. Galveston.

Jan. 18, 1934.

Rehearing Denied March 1, 1934.

H. L. Nicholson and E. R. Campbell, both of Houston, for appellants.

S. H. German and Homer L. Bruce, both of Houston (Baker, Botts, Andrews & Wharton, of Houston, of counsel), for appellees.

LANE, Justice.

W. L. Macatee & Sons, a copartnership, were engaged in the sale of building material in the city of Houston, Tex. Fred B. Chambers was a general contractor and was, at the time of the transactions forming the basis of this suit, a customer of Macatee & Sons, as he had been for many years theretofore, purchasing building materials from them in carrying out his contracts for the construction of buildings. Chambers had contracts with the Board of Education of the Houston Independent School District of the City of Houston for the construction of two large school buildings, one the Sidney Johnston school building and the other a building located at the intersection of Merrell and Beauchamp streets, known as Travis school. The transactions forming the basis of this suit, however, are those relating to the contract and construction alone of the latter building.

As a part of and connected with the execution of the contract to build the Travis school building and as required by article 5160 of our Revised Civil Statutes, Chambers, as principal, and Indemnity Insurance Company of North America, as surety, executed a bond guaranteeing the faithful performance of Chambers' contract with the school board. Such bond is for $44,300. It recited that the contract had been entered into between Chambers, as contractor, and the school board, as builder, of the Travis school building. The amount to be paid to Chambers by the school board for the construction of said building was $88,598.

One pertinent part of the bond is as follows: "Now, therefore, the said principal and surety obligate and bind themselves that they will faithfully perform said contract and make prompt payment to all persons supplying the principal *with labor* and material in the prosecution of said work. If the principal shall faithfully perform said contract according to the terms, covenants and conditions thereof, by the principal to be performed, *and shall pay all sub-contractors, workmen, laborers, mechanics and furnishers of material, as their interests may appear*, then this obligation shall be void; otherwise, to remain in full force and effect." (Italics ours.)

The bond also provides: "That should the

obligees (laborers and others) be put to any expense for the enforcement of the contract or this bond, the same shall be paid by the principal and surety to the owner, sub-contractor, workmen, laborers, mechanics, and furnishers of material, as their interest may appear."

In the construction of the Travis school building, Chambers had to have some one finance his pay rolls due to laborers engaged in the work of such construction. To procure such financial aid he applied to Macatee & Sons, from whom he had purchased a large amount of building material. Upon such application being made it was agreed between Macatee & Sons and Chambers that Chambers should make, or cause to be made, a weekly pay roll showing the amount due laborers who had for the respective week performed labor in the construction of the Travis school building, and that upon the same being presented to Macatee & Sons there should be firmly attached thereto and on the front thereof a sheet of paper which should contain the following form of transfer: "The money covering the wages set out on the attached sheets having been paid to us by W. L. Macatee & Sons, we hereby assign to W. L. Macatee & Sons our respective claims for such wages, and subrogate them to all of our rights under such claims." And that if such pay roll was so made and presented with such transfer attached, Macatee & Sons would turn over to Chambers money necessary to pay off the wages of the laborers, shown on the several weekly pay rolls, such money to be paid to the respective laborers, provided they should each sign the respective pay rolls with the aforesaid transfer attached thereto. Such pay rolls were made out, presented to Macatee & Sons by Chambers or his authorized agent, and the paper containing the transfer was firmly attached to and on the front page of such pay rolls, and the necessary money mentioned was turned over to Chambers to be used in the payment of the laborers' wages shown by the pay roll to be due them, respectively, upon their signing the pay roll.

With the money mentioned being in the hands of Chambers, W. W. Treloar, bookkeeper and timekeeper for Chambers, called the several laborers to whom wages were due, as shown by the respective pay rolls, to the window of his office, and upon their signing the pay roll with the transfer mentioned attached thereto, he would pay such laborer the wages due him. All and each of the laborers shown on the pay roll, except a few whose names were signed without authority and who will be hereinafter mentioned, signed the pay roll in person or by their marks before any payment was made to them.

The money advanced by Macatee & Sons, paid to the laborers shown on the several pay rolls, not repaid, amounted to a total of $28,142.45, which includes the sum of $5,337.85 paid to laborers who did not sign the pay roll and transfer, and also the sum furnished to and personally used by Chambers himself, which amount is not now claimed to be a liability of the Indemnity Company, the bondsmen, to Macatee & Sons. The net sum paid to those who signed the transfer, exclusive of Chambers and those not signing, was $22,804.60.

After these payrolls with the transfer attached had been signed and the wages to the laborers paid, such transfer was delivered to Macatee & Sons.

There were nineteen of such transfers, one of which was executed on the 9th day of July, 1926, and the others one each at the end of each week thereafter up to November 11, 1926, covering a period of more than four months.

It was shown that on November 11, 1926, Chambers, the contractor, gave up the job and the surety company took over the work and completed the building; that the surety company received from the school board that part of the contract price that Chambers had not received; that the school board paid to Chambers and the surety company together the entire contract price of $88,598; that the surety company paid all unpaid bills on the job, except the sum then claimed by Macatee & Sons amounting to $28,142.45, which it refused to pay, or any part thereof.

W. L. Macatee & Sons, a copartnership composed of W. L. Macatee, J. I. Macatee, George P. Macatee, Mrs. Mary Grunewald, and Mrs. Cora McEnnis, brought this suit against Fred B. Chambers, Indemnity Insurance Company of North America, hereinafter referred to as the Indemnity Company, and the Board of Education of Houston Independent School District of Houston, Harris County, Tex., to recover from Fred B. Chambers and the Indemnity Company the sum of $28,142.45, alleged to be the sum due to laborers for work performed on the erection of said school building, which was transferred to the plaintiffs by the several laborers and Fred B. Chambers, and which said sum was by plaintiffs paid to said laborers and the said Chambers. They also sued for $2,814.25 as attorney's fees.

The plaintiffs substantially alleged the facts shown in our preliminary statement. They also alleged that the school board had on hand a part of the money agreed to be paid to Chambers under the building contract in the sum of $5,000, which should be paid to them.

Fred B. Chambers and the school board answered by general denials.

The Indemnity Company answered by a general denial and by specially alleging that the laborers furnishing the labor on the building, when they received the sum due them for their labor and signed the pay rolls (to which the transfer provision was attached); "did not know that the money being paid to them was being furnished by plaintiffs but thought and understood it was money being paid to them by the defendant Chambers, and not by plaintiffs or by anyone else, and did not know that said assignments were attached to said pay rolls, and in signing said pay rolls intended thereby merely to acknowledge receipt from the defendant Chambers of the amounts being paid to them and did not intend thereby to assign their said claims for wages due them to plaintiffs."

It also alleged that the amounts sued for by plaintiffs had been fully paid to appellants by the school board.

The statement of the answer of the Indemnity Company, as above stated, is sufficient for a comprehensive understanding of its contentions made on this appeal relative to the plaintiffs' suit. It, however, filed a cross-action against Fred B. Chambers, and alleged that Chambers failed to perform his contract and by reason of such failure it, as his surety, was compelled to take over the job and complete the construction of the school building, and that in so doing it necessarily incurred expenses in the sum of $9,868.18 over and above any sum it received from the school board, which said sum it paid with its own funds; that no part of such sum had been repaid to it. It further alleged that Fred B. Chambers, by a contract of date June 6, 1924, "granted a lien to it upon all tools, plant, equipment, and material of every nature" that he (Chambers) had upon the work or upon the site of the school building to secure the payment of all sums that might become due by Chambers to cross-plaintiff under and by virtue of said contract with the school board, and the bond executed by it as surety for Chambers, and that by virtue thereof it has a lien on all of said tools, plant, equipment, and materials to secure the payment of the above mentioned sum of $9,868.18 and any judgment

that it might obtain against Chambers on account of the claims asserted by the plaintiffs against cross-plaintiff. It alleged that said tools, plant, etc., upon which it has its lien, is in possession of Chambers, and that it is not informed of what they consist, and for that reason it is unable to allege more specifically of what they consist. Cross-plaintiff prayed for judgment against Fred B. Chambers for the said sum of $9,868.18 with 6 per cent. interest per annum from the dates upon which the several sums comprising the sum of $9,868.18 were paid by it, and that it have judgment against Chambers for any amount that plaintiffs may recover against it. It also prayed for a foreclosure of its alleged lien against Chambers.

The case was tried before the court without a jury, and judgment was rendered for the plaintiffs against Fred B. Chambers for the sum of $37,136.92, and for them against Chambers and the Indemnity Company for the sum of $790.78; such sum being the amount of wages shown on the pay rolls transferred to have been paid to W. M. Treloar; it being admitted that Treloar knowingly signed said transfer. Judgment was also rendered in favor of the Indemnity Company against Fred B. Chambers for two sums, one for $790.78, and the other for $13,097.32. Judgment was rendered denying any recovery against the school board.

W. L. Macatee & Sons alone have appealed.

No complaint being made by any one of the judgments rendered against Chambers in favor of the Indemnity Company, nor the one for the school board, such judgments are in all things affirmed.

Appellants, Macatee & Sons, insist that the undisputed evidence shows that the pay rolls, with the transfer heretofore mentioned firmly attached thereto, constitute a valid transfer of the wages shown to be due the laborers who signed such transfer to plaintiffs, including W. M. Treloar, which wages amounted to the sum of $22,142.45, including the amount of $790.78 due to Treloar for which judgment was rendered for plaintiffs, and therefore the court erred in not rendering judgment for them against the Indemnity Company for the full amount of the sum transferred to them by the laborers who signed such transfer, to wit, the sum of $22,804.60, instead of $790.78, together with interest thereon from the 5th day of July, 1927, up to July 13, 1932, at 6 per cent. per annum, and for 10 per cent. on the sum due as attorney's fees, provided for in the aforementioned bond.

The only controversies as between Macatee

& Sons and the Indemnity Company, as we see them, are these: Macatee & Sons contend that the pay rolls for the nineteen weeks, beginning on the 9th day of July, 1926, and ending on the 14th day of November of the same year, to which the transfer was attached, which were signed weekly by the wage-earners, constitute valid assignments of the wages of the signers to Macatee & Sons, and that by virtue of such transfers and the bond executed by Chambers, as principal, and the Indemnity Company, as surety, they are entitled to a recovery of the sums so transferred against the Indemnity Company, and that by virtue of the provisions of said bond they are also entitled to 10 per cent. on the sum recovered as an attorney's fee.

On the other hand, the Indemnity Company contends: (1) That Macatee & Sons were not entitled to a recovery of any sum from the Indemnity Company, as it was not shown by the evidence that the laborers, other than Treloar, knew that Macatee & Sons were furnishing the money to Chambers, or that the alleged assignments were attached to the pay rolls, their claims for wages were not assigned to Macatee & Sons, and therefore the surety company was not liable to them for such wages, though, as a matter of fact, such wages were paid with money furnished by Macatee & Sons; and (2) that Macatee & Sons were entitled to no attorney's fees by reason of expenses incurred in this suit, as against the surety company, because the provision in the bond for the payment of expenses incurred in collecting such wages was an agreement to pay any expenses incurred by the *laborers* in enforcing the bond, and not an agreement to pay any expenses incurred by assignees of the laborers.

■■ We think both of appellants' contentions should be sustained. There is no evidence showing that the laborers were induced to sign the pay rolls by any false or fraudulent representation or concealment. The undisputed evidence shows that the instruments signed by the laborers consisted of ordinary pay rolls with the transfer papers attached to the front thereof. These instruments, nineteen in number, were presented to the laborers in plain view and were signed by them, one each week for nineteen weeks. In such circumstances, it is unthinkable that they still thought that they were signing only ordinary pay rolls as receipts. There were many of the wage signers, and not one of them testified that he did not know that the assignment or transfer was attached to the several pay rolls, nor did any one of them testify that he did not know what he was signing or that he thought he was signing ordinary pay rolls. The surety company was defending on the theory that the wages were not transferred by the signed instruments, because the wage-earners did not read the instruments signed by them, one each at the end of each week for nineteen weeks, and that they did not know its contents. Such being a fact, if such things were true, they were a defense only to the plaintiffs' suit upon the assignments or transfers, and the burden was on the defendant to prove the existence of the facts relied on by it as a defense. In the absence of proof that one was induced to sign an instrument by false or fraudulent representations or concealment, the legal presumption is that he knew what he was signing, and in such case he cannot be heard to say he did not read the instrument, nor have it read or explained to him before signing it. 10 Texas Jurisprudence, p. 98; 13 Corpus Juris, at page 370, § 251; 13 Corpus Juris, 372; 6 R. C. L. p. 624, § 43; Patterson v. Yellow Cab Mfg. Co. (Tex. Civ. App.) 298 S. W. 918, 920; National Union Fire Ins. Co. v. Peck (Tex. Civ. App.) 296 S. W. 338; Keystone Pipe & Supply Co. v. Kleeden (Tex. Civ. App.) 299 S. W. 671, 673; Kansas City Packing Box Co. v. Spies (Tex. Civ. App.) 109 S. W. 432, 434; Clack v. Wood, 14 Tex. Civ. App. 400, 37 S. W. 188; Moerlein v. Scottish Mortg. & Inv. Co., 9 Tex. Civ. App. 415, 29 S. W. 162, 948; National Equitable Society v. Carpenter (Tex. Civ. App.) 184 S. W. 585. The holding in many other cases cited by appellants is to the same effect as those above cited.

In 13 Corpus Juris, p. 372, it is said: "A party's mere ignorance occasioned by his limited intelligence and understanding of the language and of the contents of the contract which he voluntarily executes, is not, in the absence of fraud, a ground for avoiding it, although it is different from what he supposed; so where a person cannot read the language in which a contract is written, it is ordinarily as much his duty to procure some person to read and explain it to him before he signs it as it would be to read it before he signed it if he were able so to do, and his failure to obtain a reading and an explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents."

In 10 Texas Jurisprudence, p. 98, it is said: "A party who negligently fails to read a contract which he signs may not avoid its binding effect by the plea that he was ignorant of or mistaken as to its contents; he must show

490

something on the part of the opposite party whereby he was prevented from reading it, or at least excused for his failure to do so."

In Keystone Pipe & Supply Co. v. Kleeden, supra, the court quoted with approval from 13 Corpus Juris, § 248, the following: "The general rule of law is that a person is bound by an agreement to which he has assented where this assent is uninfluenced by fraud, violence, undue influence or the like, and he will not be permitted to say that he did not intend to agree to its terms."

It also quotes with approval the above quotations from 13 Corpus Juris, p. 370, § 240, and it also quotes with approval from 6 R. C. L. p. 624, § 43, the following: "It is not alleged that plaintiff's representative, who executed the contract for plaintiff company, made any false representations as to the contents of the writing, nor that Kleeden, who represented the defendants, was illiterate, nor that there was any confidential relation existing between the parties who actually executed it."

In Patterson v. Yellow Cab Mfg. Co., supra, it is said: "In the absence of fraud, misrepresentation, or concealment, the rule is well established that one who can read and who signs a contract without reading it, and under circumstances which do not preclude an exercise of due diligence upon his part to ascertain the contents of the contract, will not be heard afterward to say that he did not read it and did not understand its provisions. As was said by the Supreme Court of the United States in Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203:

" 'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, nor did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.' "

In Kansas City Packing Box Co. v. Spies, supra, it is said: "It is a well-recognized and applied principle of law that, if a person signs or accepts a written contract with full opportunity of informing himself as to its contents, he cannot avoid liability on the ground that he was mistaken as to its contents, in the absence of fraud or misrepresentations."

In Moerlein v. Scottish Mortgage & Inv. Co., 9 Tex. Civ. App. 415, 29 S. W. 162, 948, it is said: "Appellants contend that, inasmuch as Mrs. Moerlein did not know the contents of the deed of trust disclaiming homestead in the property, she would not be estopped. * * * If Mrs. Moerlein did not read the statements in the deed of trust, it was her fault. No one prevented her from reading them. Brown Bros. did not prevent her, and they had the same effect in deceiving them, and inducing them to loan the money, as if she had read and understood them. She cannot now be heard to say she did not know what she was doing. She was culpably negligent in not informing herself of the contents of the instrument she was signing."

Other cases cited sustain the contentions of appellant.

That Macatee & Sons furnished the money in the payment of the pay rolls in question, and that the laborers signed the transfer in question, is undisputed. That there were no false or fraudulent representations or concealment made to or practiced upon any one of said laborers to induce them to sign the transfer must be conceded. We, therefore, conclude from the facts shown, and the law applicable thereto, that the instruments constitute valid transfers from the laborers to Macatee & Sons of their wages, resulting in Macatee & Sons becoming assignees of such wages who, under the terms of the bond executed by the Indemnity Company, are entitled to a recovery against the Indemnity Company for the sums shown by the pay rolls assigned to have been paid with money furnished by Macatee & Sons for such purpose, to wit, $22,804.60, with 6 per cent. interest per annum thereon from the 11th day of November, 1926, to the entry of judgment in this cause by the lower court. Having reached such conclusion, the judgment awarding to Macatee & Sons the sum only of $790.78 against the Indemnity Company is reversed, and judgment is here rendered for Macatee & Sons against the Indemnity Insurance Company of North America for the principal sum of $22,804.60, together with interest at the rate of 6 per cent. per annum from the 11th day of November, 1926, to the date judgment was rendered in the trial court in this case.

Judgment is also here rendered in favor of Macatee & Sons against said company for 10 per cent. on the judgment rendered, principal and interest, as attorney's fee.

It is also ordered that the total sum so awarded, principal, interest, and attorney's fee, shall bear interest, from the judgment rendered in the trial court until the same is paid, at the rate of 6 per cent. per annum.

Affirmed in part; and reversed and rendered in part.