WILDER *v.* DETROIT EDISON COMPANY.

INJUNCTION—ELECTRIC TOWER AND HIGH-TENSION LINES—RIGHT-OF-
WAY—FRAUD—BURDEN OF PROOF.

> Owners of 8-acre tract of land 270′ east and west by 1,330′ north
> and south who signed, without reading, right-of-way agreement
> empowering electric company to erect transmission lines with
> towers in west part of tract *held,* not entitled to enjoin erection
> of towers and high-tension lines 95′ from west side of tract,
> where company has acquired other rights-of-way and com-
> menced erection of high-tension lines and towers in reliance
> upon the agreement and plaintiffs had failed to sustain their
> burden of proving fraud in the procurement of the agreement
> with claim that only a pole line was to be put up at westerly
> boundary.

Appeal from Macomb; Noe (Alton H.), J. Sub-
mitted April 5, 1957. (Docket No. 51, Calendar No.
47,045.) Decided July 31, 1957.

Bill by John E. Wilder and Marie L. Wilder
against the Detroit Edison Company, a foreign cor-
poration, to cancel permit for a right-of-way and to
enjoin erection of towers and electric lines. Bill
dismissed. Plaintiffs appeal. Affirmed.

*LaBarge, Kramer, Hudnut & Cashen (James H.
Hudnut,* of counsel), for plaintiffs.

*Fischer, Sprague, Franklin & Ford (Kenneth B.
McConnell,* of counsel), for defendant.

REFERENCES FOR POINTS IN HEADNOTES
17A Am Jur, Easements § 183 *et seq.*

Voelker, J.    The defendant planned to erect a high-tension tower line between 2 step-down stations located about 9 miles apart so it dispatched a man to obtain permission from the landowners along the proposed right-of-way.    On October 15, 1952, Edison's Bela Wagner visited the plaintiff's home about 8 a.m. and explained his mission to the plaintiff John Wilder and showed him an informal drawing of the plaintiffs' land. . John Wilder was just about to leave for the day so he signed and delivered the following permit without reading it or having it read to him:

"Tower Line Permit
Date October 15, 1952

"In consideration of the sum of $1 and other valuable considerations, receipt of which is hereby acknowledged, we hereby grant to the Detroit Edison Company, its successors and assigns, the right to construct, operate and maintain its lines for the transmission and distribution of electricity and company communication facilities, including the necessary towers, fixtures, wires and equipment, and including also the right to trim or cut down any trees along said lines, which could fall into the lines or interfere in any way with their operation upon, over and across our property located in Warren township, county of Macomb, State of Michigan, and described as follows:

"Commencing at the southwest corner of section 1, thn N 84° 40′ E 1,465.9 ft; thence N O° 09′ E 1,332.-24 ft to the point of beginning; th N O° 09′ E 1,336.37 ft; th S 83° 17′ W 274.05 ft; thence S 1,329.38 ft; th N 84° 40′ E 269.83 ft to the point of beginning in section 1, T1N R12E, 8.27 acres.

"The route of the lines shall be as follows: In a northerly and southerly direction across the west part of said land.

"The company, its successors and assigns, shall reimburse us for all damage to growing crops, buildings or fences, caused by its men, teams, trucks, and

other vehicles and equipment in entering said property for the purposes set forth herein.

"In addition to the above consideration, the company, or its successors and assigns, shall pay us the sum of $100 for each tower on said land, the same to be paid before any towers are erected."

The next day John Wilder's wife Marie, who had not been home earlier, also signed and redelivered the permit without reading or discussing it, acting upon the interim advice of her absent husband. Edison subsequently cleared a right-of-way and took steps toward the erection of 2 steel high-tension towers running north to south in the west half of the plaintiffs' land. Plaintiffs' property was unimproved farm property consisting of an 8-acre parcel in Macomb county approximately 270 feet wide east and west and 1,300 feet long north and south.

On December 9, 1953, the plaintiffs filed their bill of complaint seeking to cancel the above permit because of fraud and the misrepresentation of Edison's agent that (1) a wooden pole line was to be built instead of steel towers and (2) that the route of the line was to be along the west boundary of the land whereas the permit said the route "shall be across the west part of said land." They also sought a temporary injunction against the erection of the steel towers.

In an affidavit filed in opposition to the temporary injunction Edison stated that it had to date acquired rights-of-way across about 96 parcels of land; that the Wilder and many other connecting rights-of-way grants had been recorded with the register of deeds for Macomb county; and that in reliance upon plaintiffs' permit it had spent large sums of money in surveying, staking, and constructing the 9-mile line; that about half of the steel towers had been erected,

part of the cables strung, and that nearly all of the steel footings for the towers had been erected.

On December 14, 1953, the trial court declined to grant a temporary injunction. On December 29, 1953, Edison in its answer denied the material allegations of the bill and again averred that in reliance upon the plaintiffs' permit it had "expended large sums of money in acquiring connecting rights-of-way and in surveying and partially constructing a steel tower transmission line across said land and adjacent lands." No appeal being taken by the plaintiffs from the court's refusal to grant a temporary injunction Edison proceeded to erect the 2 towers. It had tendered its check to the plaintiffs for $200 for the erection of the 2 towers prior to the institution of suit but the checks were returned by Mr. Wilder.

At the hearing on March 28, 1956, the plaintiff John Wilder testified that for 25 years he had been a general contractor in and around Detroit; that he had performed contracting work all over the State; that during all that time he had frequently done business with Detroit Edison and "never had a firm that was nicer or better to deal with;" that Edison's agent had called at his home the morning the permit was signed just as he was leaving; that Mr. Wagner had told him that Edison wanted to set "poles" on the "west side" of his land; that before he signed the permit he made sure from Mr. Wagner that the "poles" would be put along the west border; that when he signed it was only his intention to permit Edison to erect a light wooden pole line down the extreme westerly boundary of his property; that he signed the permit without reading it because his dealings with Edison had been so good for so long; and that in any case he thought it would improve the value of his property to have a pole line there.

A surveyor called by plaintiffs testified as to the land measurements; the size of the 2 towers; that

they were erected 95 feet east of the west boundary and 179 feet west of the east boundary; and that they were erected on the west half of the plaintiffs' land.

Mrs. Wilder testified briefly to the effect that she signed because her husband had directed her to. Edison's agent, Bela Wagner, called for cross-examination under the statute,* testified in substance denying the allegations and testimony of John Wilder; declaring that he had left a copy of the permit with Mr. Wilder; and further stating that the permit was the standard form of agreement used by his company for permission to erect towers. At the close of the plaintiffs' proofs the defense moved for dismissal which the court granted and entered its decree from which this appeal has resulted.

\* \* \*

We think this case must be controlled by our decision in *Powers* v. *Indiana & Michigan Electric Co.,* 252 Mich 585. There the plaintiffs sought similar relief under similar allegations of fraud and misrepresentation and there we sustained a decree dismissing the bill. Our Court there said, referring to the plaintiffs (p 588):

"We cannot agree with plaintiffs. They were intelligent people, and no reasonable explanation or excuse appears in this record which would justify them in executing these written instruments without either reading them or having them read over to them. We have recently had occasion to hold that granting relief under such circumstances tends strongly to deprive one of the security which should be afforded by solemnly-written instruments." (Citing cases.)

The Court then quoted from *Upton* v. *Tribilcock,* 91 US 45, 50 (23 L ed 203), as follows:

---

* CL 1948, § 617.66 (Stat Ann § 27.915).—REPORTER.

" 'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and if he will not read what he signs, he alone is responsible for his omission.' "

These are brave ringing words, and yet they leave us curiously uneasy and dissatisfied. We find ourselves wondering whether the Court wasn't more nearly stating a conclusion than giving the reason for its result. We wonder, too, whether the humble mind of man can ever encompass the statement of an undeviating rule capable of covering these all too human situations.

We fear it will not do for us to announce a hard and fast rule that we will never grant relief to people who sign agreements without reading them. We fear because we suspect that the very next term of court we may be haunted by our words and have to swallow them. Perhaps all we can ever safely say is that it all depends. All depends on what? On the circumstances of each case, we must lamely answer.

Clearly ours is not a case of a glib, double-talking salesman signing up a distracted housewife on an unconscionable contract nor yet the case of a perspiring mechanic who has not gone beyond the fourth grade blindly signing up for an expensive correspondence course on how to be a nuclear physicist—in 12 easy lessons. Any man who for 25 years has survived amidst the blood trails and snarling water holes of that gentle asphalt jungle known as general contracting in the Detroit area can scarcely be placed on a par with them.

Thus the experience, education and intelligence of the claimed victim is a factor—but is it the only

factor? We know that even highly intelligent people have been woefully gulled and fleeced in the past —as they doubtless will in the future. We know that courts in proper cases have granted such victims relief in the past as we suspect they will continue to do in the future. We also know that the very crux of some frauds lies precisely in *getting* the intended victim to sign without reading—and here we may be skating close to the core of our case. Was it Bela Wagner's alleged lies or John Wilder's admitted hurry that made the latter sign without reading?

Cases in which careless people sign agreements in haste and repent at leisure, claiming fraud and deception in the inducement, continue to clog our courts and fill our books. These situations are in fact among the most vexing with which judges have to grapple. On the one hand the law is said to abhor deceit and fraud; on the other it must strive somehow to preserve the sanctity of written contracts, else all is chaos. Determination of when the shadowy twilight zone is passed where the one good end must transcend the other is frequently difficult to rationalize in one's head let alone articulate. Sonorous platitude is usually our reward for attempting the latter. We suspect that there is something at once very simple and elusively subtle and subjective involved in the process. Some situations we find simply too repugnant; others not.

Judges love rules and are frequently baffled when they cannot invoke them. If we will not venture to state a rule, then, we can at least pose a few of the factors we deem of some possible utility when we are confronted with these perplexing situations. Is this thing really likely to have happened this way? What kind of an operator is he who procured the writing? What was in it for him? How does this situation stack up with the common experience of mankind? Is this truly a case of the fox and the

shorn lamb? Have the parties in apparent good faith substantially altered their positions in reliance upon the writing? What are the "overtones" of the case or record before us? These are only some of the considerations involved. We hasten to add that we are not urging that every judge become his own jury or private lie-detecting machine. But judges happily do not come entirely naked and unworldly to their black robes. We trust also that in the transition they are not expected to discard whatever fund of common sense they may have possessed.

One guesses that the heart of the answer here lies in the fact that Mr. Wilder was a smart man who should have known better. Perhaps another is the inherent improbability that a responsible utility company would have an experienced right-of-way man going around deceiving people in the manner claimed. All ethics aside, good business alone would seem to dictate to Edison that truth is cheaper than litigation. Especially so when one is about to spend thousands on a chain of events in which the disputed writing was a single but integral link. Translated into an acceptable legal conclusion we think this means that we must agree with the circuit judge that the plaintiffs have failed to sustain the burden of proof as to fraud. The decree of the lower court is accordingly affirmed, with costs.

SMITH, EDWARDS, CARR, and BLACK, JJ., concurred with VOELKER, J.

DETHMERS, C. J., and SHARPE, and KELLY, JJ., concurred in the result.