MANUFACTURERS CASUALTY INSURANCE COMPANY *v.*
HUGHES.

5-1587                                          316 S. W. 2d 827

Opinion delivered October 20, 1958.

504

W. B. Putman, for appellant.

*James R. Hale* and *Rex W. Perkins* for appellees; *Howard Cockrill*, of *Cockrill, Limerick & Laser*, for Assn. of Casualty and Surety Companies, *amicus curiae*.

CARLETON HARRIS, Chief Justice. On June 26, 1956, in the city of Fayetteville, Dan A. Spencer, 22 years of age, went to the office of Chester P. Leonard, Allstate Insurance Company agent, for the purpose of obtaining automobile bodily injury and property damage liability insurance on his 1953 Chevrolet automobile. Because of the fact that Spencer did not intend to live at home, Leonard was unable to write the policy in Allstate, and turned down the application. Leonard then told Spencer that insurance was available through the Arkansas Automobile Assigned Risk Plan, which is authorized under Act 347 of 1953, said Act being known as the Motor-Vehicle Safety Responsibility Act. Spencer made application for insurance through the Plan; the application form was filled out by Leonard, signed by Spencer, and the latter executed a draft for $15, required under the terms of the Plan to be sent along with the application. The draft bore the notation: "For down payment on insurance on 1953 Chev." Later in the day, Leonard

purchased a draft with the $15, drawn payable to the Arkansas Automobile Assigned Risk Plan and mailed it, along with Spencer's application, to the Risk Plan Office in St. Louis, Missouri.

The application and draft arrived in the Risk Plan offices the next day, June 27th, and the Plan manager forwarded a notice to Manufacturers Casualty Insurance Company that the risk had been assigned to it, and called attention to the provisions of the Plan requiring the risk to be bound or a policy issued within two working days of the receipt of notice. This notice of designation was received by the company June 29th (a Friday), and on July 2nd, the insurance company notified Spencer that it was binding coverage on that date. Under terms of the Plan, Saturday and Sunday are not working days. The policy was subsequently issued and the company sent a commission to Leonard. In the meantime, unknown to the company, Spencer had, on June 27th, been involved in an accident while driving the Chevrolet, which resulted in the death of Charles Hughes. This, of course, was the same day Spencer's application was received by the Assigned Risk Plan Office and two days before the insurance company received notice that the risk had been assigned to it. Emma M. Hughes, widow of Charles Hughes, and children, instituted suit against Spencer, and the latter made demand upon appellant to defend such suit. The company declined to do so on the ground that it afforded Spencer no coverage at the time of the accident. Mrs. Hughes, et al, recovered judgment against Spencer in the sum of $5,000, and the company refused to pay the judgment. After an execution against Spencer was returned *nulla bona,* Mrs. Hughes and children instituted the instant action against Manufacturers Casualty Company praying judgment for the $5,000, the statutory 12 per cent penalty, and attorney's fees.[1] At the conclusion of appellees' evidence, and at the conclusion of all the testimony, appellant moved for a directed verdict. The

---

[1] Spencer and Leonard were also named as defendants.

motion was denied in each instance, and appellant's exceptions noted. The jury, in answer to special interrogatories, found that Leonard had represented to Spencer that his insurance became effective upon payment of the $15 to Leonard, and further found that Spencer was justified in relying upon such representation. The court found, as a matter of law, that Leonard was acting as the agent of Manufacturers Casualty Insurance Company, and also found that Spencer was entitled to recover $500 on a cross-complaint filed against the company, representing attorney's fees expended by Spencer in defending the original suit. Verdicts were directed in favor of Spencer and Leonard on the plaintiff's complaint, and judgment was entered against appellant in favor of Emma M. Hughes, et al, for $5,000, plus penalty in the amount of $600 and attorney's fee in the amount of $750, together with costs; judgment was entered in favor of Spencer against the company for $500 and costs. From the judgment of the court, appellant brings this appeal.

Perhaps first, a brief discussion of the purpose of Act 347 of 1953, and the Assigned Risk Plan is in order. The purpose of the Act is expressed in the title: "AN ACT to Eliminate the Reckless and Irresponsible Driver From the Highways and to Provide for the Giving of Security and Proof of Financial Responsibility By Persons Driving or Owning Vehicles of a Type Subject to Registration Under the Laws of This State; and for Other Purposes." In general, the Act makes certain requirements of one who has been involved in an accident, and provides methods for the establishment of future financial responsibility for those who have been convicted of certain offenses under the Motor-Vehicle laws, or who have failed to pay judgments arising from causes of action from automobile accidents. The assigned Risk Plan is authorized by Optional Section 86 of the Act, and reads as follows:

"Assigned Risk Plans. After consultation with the insurance companies authorized to issue automobile li-

ability policies in this State, the Commissioner of Insurance shall approve a reasonable plan or plans, fair to the insurers and equitable to their policyholders, for the apportionment among such companies of applicants for such policies and for motor-vehicle liability policies who are in good faith entitled to, but unable to procure such policies through ordinary methods. When any such plan has been approved, all such insurance companies shall subscribe thereto and participate therein.  *  *  *''

The purpose of this Section is to provide insurance for those persons who cannot obtain liability insurance in the regular manner, though some of these may not have necessarily been involved in accidents, and perhaps have no record as traffic violators. For instance, many companies are reluctant to insure an elderly driver; many refuse to accept the application of a teen-age driver; still others have regulations preventing the acceptance, in the normal course of business, of an application such as we have in the instant case (Allstate Insurance Company would not issue a policy because of the fact that Spencer was not going to remain at home). In each of these instances, the refusal of the company is not based upon any misconduct of the applicant, but only because of the general policy of that company which refuses that type of risk. Pursuant to this Section, the Insurance Commissioner worked out a plan with the insurers authorized to issue automobile liability policies within this State, and all such companies are required to participate in the Plan.[2] The purposes are set forth in Section One of the instrument:

"a. To provide a means by which a risk that is in good faith entitled to automobile bodily injury and property damage liability insurance in the State, but is unable to secure it for itself, may be assigned to an authorized insurance carrier.

---

[2] The company can only turn down a risk assigned to it for good cause; *i.e.*, investigation reveals the driver to be irresponsible, reckless, etc.

b. To establish a procedure for the equitable distribution of such assigned risks among such insurance carriers.''

The Plan provides that an eligible applicant shall make his application and may designate any licensed agent of an authorized insurance carrier to act in his behalf in soliciting coverage. The application is then sent to the Manager of the Plan. Section 42 provides that the Manager shall designate an insurer to whom the risk will be assigned. Section 43 provides that upon receipt of notice of designation, and the premium or deposit from the Manager, the designated insurance company shall, within two working days,

''1. Issue a policy or binder if all information necessary for the carrier to fix the proper rate is contained in the application form, such policy to become effective 12:01 a.m. on the day following the second working day, or

2. Bind the risk if all information necessary for carrier to fix the proper rate is not contained in the application form, such binder to become effective 12:01 a.m. on the day following the second working day, or

3. In the event such carrier does not have on file rates applicable to the risks assigned to it, make the necessary filing and immediately upon its becoming effective issue a policy or binder, such policy or binder to become effective 12:01 a.m. on the day following the second working day following the effective date of the filing.

\* \* \* \* \*

The day on which the notice of designation and deposit are received from the Manager shall be deemed the first working day, whatever may be the time of such receipt.''

The provisions of the Plan here under discussion appear reasonable, and consistent with the Statute. The two working days which are allowed the designated company as a period within which to issue a policy or binder, would certainly appear to be a reasonable period of

time. This being true, it follows as stated in Volume 42, American Jurisprudence, page 432:

"Rules, regulations, and general orders enacted by administrative authorities pursuant to the powers delegated to them have the force and effect of law. * * * Administrative regulations are binding on all persons subject to them without notice, and the courts will take judicial notice of them. * * *"

Appellees questioned the materiality and relevancy of the Plan when it was introduced at the trial of the case, but *since Spencer applied, and was insured, under its provisions, we certainly deem such provisions relevant.*

We have concluded that Spencer, at the time of the accident, was not insured by appellant. This conclusion is reached because Spencer was not covered under the terms of the application executed by him and sent in to St. Louis, and as a matter of law, Leonard was without authority to orally bind the risk. At the top of the applicatin form, which was signed by Spencer, appears the word, in large black type, "Important." Immediately beneath this word, appears the following:

"This application must be filled out in duplicate and accompanied by the investigation fee or deposit premium prescribed in the Assigned Risk Plan. Every item must be completed and answers typewritten or written legibly in ink. If you are eligible for insurance under the Plan, the allowance to the producer of record for services rendered in connection with this application will be paid by the company to which the risk is assigned.

*This application does not constitute a binder of insurance. Coverage becomes effective only in accordance with the terms of the Plan.*[3]"

The application lists certain questions relative to the occupation of the applicant, the purposes for which the car will be used, and certain information relative to the driving record of applicant. The testimony reflects that these questions were asked Spencer by Leonard,

---

[3] Emphasis supplied.

and the answers inserted by the latter, following which, the application was handed to Spencer, and signed by him. Spencer stated that he signed the application, but did not read it before signing. His testimony was to the effect that he "understood" he had insurance as of that date, though he admitted that he knew he was not being insured by Allstate, and was not told by Leonard that the latter represented Manufacturers Casualty;[4] he would neither affirm nor deny that Leeonard explained to him that coverage would only become effective in accordance with the terms of the Plan, and that the application was not a binder. Leonard testified that he explained the Plan to Spencer, and told applicant that he had best be careful because "* * * you won't have any insurance for two or three days, until you get a letter back from the company that gets your assignment or gets you a policy back." He further stated that he did not know of Manufacturers Casualty Insurance Company at the time of taking Spencer's application. Under the view we take, the conversation between the parties, and what Leonard may have said, or left unsaid, are immaterial, and the court accordingly erred in submitting the interrogatories to the jury.[5] The application very clearly and emphatically provides that it does not constitute a binder of insurance. In *Universal C.I.T. Credit Corporation* v. *Lackey,* 228 Ark. 101, 305 S. W. 2d 858, we quoted from *Texas Company* v. *Williams,* 178 Ark. 1110, 135 S. W. 2d 309, which Opinion had quoted *Upton* v. *Tribilcock,* 91 U. S. 45, as follows:

" 'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it,

---

[4] Spencer testified that the first time he ever heard the name "Manufacturers Casualty Insurance Company" was when he received the bill for the balance of his premium.

[5] The interrogatories were as follows: 1. Was a representation made by Leonard to Spencer that upon acceptance by Leonard of $15.00 check on June 26, 1956, that Spencer was covered by insurance on that date. Answer: Yes or No. 2. Was Spencer justified in relying upon representations of Leonard on 26 June, 1956, if you find such representations were made by Leonard to Spencer, that insurance was effective upon recept of $15.00 check? Answer: Yes or no.

or did not know what it contained. If this were permitted contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.' ''

While Spencer did not sign a contract, the same rule applies to his failure to read the offer made. There is no evidence in the cause before us that Spencer's signature was obtained through fraud, and though we recognize that possibly many individuals sign instruments without reading them, in such event, the signer does so at his own risk. In the matter before us, by simply reading the opening paragraph, Spencer would have known that he was not then covered.

Aside from this point, there is an even more decisive reason why appellees cannot prevail. For affirmance of the judgment, they rely, as indeed they must, upon the alleged ''oral binder'' by Leonard. They argue that by becoming a member of the Assigned Risk Plan, appellant made Leonard its agent, to take applications for policies, to issue binders, and to enter into the contract for insurance made with Spencer. It is pointed out that the policy itself listed Leonard as ''local agent or broker.'' The company forwarded the policy to Leonard, who in turn, delivered it by mail to Spencer, and the company sent Leonard a check for his commission.

We cannot agree, that by becoming a member of the Plan, appellant designated Leonard as its agent. Appellant, as an insurance company doing business in this state, was required to enter the Plan, but its obligations, duties, and liabilities as such a member, are limited by the provisions of the Plan itself. It is true that the company forwarded the policy to Leonard, and that his name was listed under the space for the name of the local agent or broker (a standard company policy, but stamped ''Assigned Risk'') ; that he in turn delivered the policy to Spencer, and Leonard received a commission from appellant. This procedure is provided for in

the Plan, but Section 41 of that instrument clearly negatives any contention that Leonard was a general agent for appellant. That Section provides:

"A risk which desired insurance and has been unable to obtain it for itself, and thus becomes an applicant under this Plan, shall proceed in accordance with this Article and the applicant may designate any licensed agent of any licensed and authorized casualty insurance carrier to act on *his*[6] behalf in soliciting coverage from insurers as recited by Section 20 and this Article, but in either case the applicant must sign the application form.

The fully completed application, in duplicate, shall then be filed with the Manager of the Plan."

It will thus be seen that any insurance agent who is approached to make the contact for any applicant desiring to obtain insurance under the Assigned Risk Plan, *acts as the agent of the applicant rather than the agent of the insurer.* In the case of *Matsuo Yoshida* v. *Liberty Mutual Insurance Co.*, 240 F. 2d 824, we find:

"Gonzales filed his application for insurance under the California Assigned Risk Plan in early April, 1952. The Assigned Risk Plan is designed to provide automobile liability insurance for those persons who are unable to procure insurance through ordinary channels. All automobile liability insurance carriers engaged in business in California are required to participate in the Plan and each carrier is assigned its *pro rata* share of assigned risks. * * *

He made the application at the offices of Biebrach, Bruch and Moore, Inc., insurance brokers in San Jose, California. This firm represented Gonzales and was not the agent of appellee. Accordingly, any statements that may have been made by employees of the firm cannot effect appellee's substantive legal rights, for they had no authority, actual or apparent, to bind it."

---

[6] Emphasis supplied.

This is entirely in accord with reason and logic. To hold otherwise would have the effect of making each licensed casualty insurance agent in the state of Arkansas, the potential general agent of every casualty company doing business in the state. How can one be a general agent for, issue a policy, or bind, a company that he has never heard of?

For the reasons herein enumerated, we hold that the court erred in not directing a verdict for appellant at the conclusion of all the evidence, and the judgment of the circuit court is, accordingly, in all respects, reversed, and the cause of action dismissed.